FIRST CHURCH OF CHRIST, SCIENTIST, Respondent, v.
REVELL, et al, Appellants

(2 N. W.2d 674.)

(File No. 8473. Opinion filed March 4, 1942.)
Rehearing Denied May 5, 1942.

378

**Robert C. Hayes** and **Alex Rentto,** both of Deadwood, for Appellants.

**Clinton G. Richards,** of Deadwood, for Respondent.

SMITH, J. The defendants, Dr. and Mrs. Revell, claim the right to use a driveway located wholly within the boundaries of the property of the plaintiff Church. The parties are the owners of adjoining lots approximately 100 feet in depth fronting on Main Street, an east and west thoroughfare, in the city of Lead, South Dakota. The Revell property is located immediately west of the church lot, and the driveway in controversy extends along the west ten feet of the church lot. The rear of these lots is several feet below the grade of the street on which they front, and is separated from the lots immediately to the rear or south by a retaining wall several feet in height. No alley extends through the block. The driveway in question is a cul-de-sac leading downward from the street to the rear of the church property. The block is bounded on the east by Galena

Street, on the north by Main Street, and on the west by Blue Street. The evidence deals with the use made of the driveway in connection with the lots of the parties and of the lot immediately east of the church and the lot immediately west of the Revell property. The church property has the only driveway located on these inside lots, and the evidence discloses some measure of use of that driveway by tradesmen and servicemen in reaching the back portions of the other three lots.

The Revells predicate their rights on one or more of four separate theories. They assert that a clear preponderance of the evidence is against the findings and conclusions of the trial court, and that the evidence establishes (a) an easement in the driveway appurtenant to their property under the doctrine of prescription, (b) an irrevocable license to use the passageway, (c) a dedication to public use, and (d) estoppel by conduct to question their rights in the property.

In more or less broad outline the evidence discloses the following facts with but little dispute. During the early years of 1880 one Frank Caretto became the owner of the Revell property, and one Esterbrook acquired the church lot. The very primitive houses located on both properties were remodeled and improved. Within a few years Esterbrook engaged in the grocery business at a down town location and made use of a barn on the back end of his property to stable his delivery horses and to store feed and baled hay supplied to the public. By that time his property was enclosed by a fence, and in the opening to the driveway was a wooden gate. A picket fence extended along the line between the two properties (the west line of the driveway), and the only passageway between the two lots was through a small opening or gateway about opposite the rear of the houses. On several occasions the Carettos asked permission to use the driveway in having wood, coal and hay delivered to the rear of their lot. On one or more occasions Esterbrook replied "the alley is there, use it as long as you want." And they did freely use it for like purposes during the ten-

ure of the Esterbrooks which continued until 1912. Hay, coal and wood, when delivered, were thrown over the division fence from the driveway. The Caretto cow was driven through the small gate in and out of the driveway. During this period of time the Esterbrook employees were accustomed to enter the driveway and pass to the rear of the Caretto home in delivering supplies to Carettos and their neighbor on the west. A lesser like use of the driveway was made by Esterbrook's neighbor on the east. During the Esterbrook tenure Main Street was paved. At that time Esterbrook installed a paved crossing at the head of the driveway, and a new gate. One Feeney acquired the Esterbrook property in 1912 and deeded it to one Meade in 1913, and the Church took title from Meade in March of 1917 and constructed their church along the east line of the driveway a few years later. While the Church owned the property, a neighbor to the east asked and received permission to drive his car through the driveway and across the back of the church lot to his garage. A diminishing use of the alley by the Carettos continued until the Revells purchased their property in 1934.

In August of that year the Revells commenced the construction of a home which covers the full width of that lot. Incorporated into the rear of that home is a garage opening onto the church driveway, and because of walls erected around the rear of their lot the only means of passage to the garage is along the church driveway. A grade door from the Revell home, a door leading to the church reading room, and windows in both structures open onto the driveway. A narrow walk extends along the church side of the driveway.

Before purchasing the Caretto property the Revells had a survey made thereof to establish its boundaries and made an investigation through Mrs. Caretto's grandson, Mrs. Esterbrook, and others, with reference to the driveway. During this period a conference was held between Dr. Revell, in the presence of Mrs. Revell, and representatives of the Church, during which he asserted an easement and made an offer to purchase some of the church lot. The

ladies representing the Church neither admitted nor denied the existence of an easement, and in fact were uninformed as to the legal nature or the existence of an easement. The matter was permitted to drift. At a later time, while attending the Chairman of the Church Board professionally, Dr. Revell told her that if they would have a survey and prove to him that he did not have an easement he would pay the Church $100 per front foot for the property. Thereafter trees which members of the Church believed they owned were cut down by Dr. Revell's contractor, and the Church stood by without objection and watched the Revells build an expensive brick home with the described openings on the driveway. Dr. and Mrs. Revell both testified with refreshing honesty that they were not influenced in so doing by anything the members of the Church did or did not do, but depended entirely on the advice of their counsel. Neither the defendants nor their counsel made any inquiry of the members of the Church to determine whether they conceded the existence of the claimed easement, and nothing was said by Church representatives to indicate that they were not standing on their legal rights.

The court found the use of the driveway prior to 1934 to have been permissive. That this finding must stand unless against the clear preponderance of the evidence is too well settled to require citation of authority. We think no different inference could be legitimately drawn from this evidence. To hold otherwise would be to adjudge that common neighborliness may only be indulged under penalty of encumbering one's property. The use was not adverse. Use which is not hostile or adverse will not ripen into a prescriptive right. 17 Am. Jur. 974. We therefore conclude that the Carettos did not acquire an easement in the Esterbrook-Church lot.

The doctrine of an irrevocable license was recognized by this court in Butz v. Richland Township, 28 S. D. 442, 134 N. W. 895, 898. It was there said, "Where, however, the licensee has acted under the authority conferred by the licensor and has incurred expense in carrying out

its provisions, equity regards it as an executed contract, and will not permit it to be revoked." And see 33 Am. Jur. 408. In Schnuerle et ux. v. Gilbert et al., 43 S. D. 535, 180 N. W. 953, an assignee of a license claimed an executed irrevocable license, but this court held a license, on the faith of which Gilbert had made expenditures and improvement, to be personal and unassignable. If this record would sustain a finding that the Carettos made expenditures or improvements on the faith of a continuance of the parol license granted by Mr. Esterbrook, and that the Revells were assignees of that license, and we felt called upon to re-examine the assignability of such a license, the field of inquiry thus opened would be made interesting by the admitted fact that the Revells wrecked and removed all improvements made by the Carettos. We have no occasion to explore the subject, however, as it is clear that the record will not sustain a finding that the Carettos made any expenditure or improvement on the faith of a continuance of the license.

 The license to the Carrettos was revocable, personal and unassignable.

 In expounding the common-law doctrine of implied dedication of private property to a public use in an early case this court said, "Conduct on the part of the owner that is clearly expressive of an intention to dedicate usually amounts to dedication, if acted upon by the public in a manner which clearly justifies the inference of an acceptance." Larson et al. v. Chicago, M. & St. P. R. Co., 19 S. D. 284, 103 N. W. 35, 37; Mason v. City of Sioux Falls et al., 1892, 2 S. D. 640, 51 N. W. 770, 39 Am. St. Rep. 802. By the enactment of Chapter 100, Laws of 1893, reading in part, "The continued use of any road or way heretofore traveled or which shall hereafter be traveled by the public * * * across the land of any private person * * * shall not be deemed to have constituted such road or way a legal highway, or a charge upon the town in which the same is situated; and no rights or benefits shall inure to the public or any individual by the use thereof," (SDC 28.0104), it became settled that a mere showing of public use of a road-

way of the character under consideration will not support an inference of dedication to public use. Roche Realty & Investment Company v. Highlands Company, 29 S. D. 169, 135 N. W. 684, 686. Because public acceptance of this claimed dedication is based solely on user by members of the public, we hold that the record fails to establish an implied dedication at any time subsequent to July 1, 1893, the effective date of Chapter 100, Laws of 1893, quoted supra.

 Does the evidence establish implied dedication prior to that date? To support such an inference it was pointed out in Roche Realty & Investment Company v. Highlands Company, supra, that "There should be evidence of conduct on the part of the owner clearly expressive of a present intention to set apart a portion of his land to public use, * * *."

 The evidence deals with a mere cul-de-sac contained within the fenced boundaries of the grounds of a private home. It entered those grounds through an opening equipped with a gate and followed a course along and immediately adjacent to the side of the owner's home. True, the gate was seldom closed, but it stood there as a symbol of the belief of the owner in his right·to shut others out. The driveway was maintained by the owner as a passage way between the public thoroughfare and his stable, and the owner and his employees made the principal use thereof. The use by others was more or less incidental and was of such a character as not to inconvenience the owner or his family. It is significant that such general use was for the ultimate benefit of immediate neighbors who were not only close friends, but also business customers. The owner's home was unpretentious, but it was his home, and the driveway occupied about one-fifth of his humble curtilage. Because he told his neighbors that "The alley is there, use it as long as you want," and freely countenanced a general use by others over a period of years for the benefit of his immediate neighbors, it is asserted that a present intention to dedicate this portion of his grounds to indiscriminate public use is established. A clear and unequivocal present in-

tention to dedicate a part of a small home plot to public use may not be gathered by a reasonable and impartial mind from such acts of common neighborliness. We approve the statement of the applicable rule quoted in Cole et al. v. Minnesota Loan & Trust Co. et al., 17 N. D. 409, 117 N. W. 354, 359, 17 Ann. Cas. 304, as follows: " 'ownership of land once had is not to be presumed to have been parted with; but the acts and declarations relied on to show a dedication should be unequivocal and decisive, manifesting a positive and unmistakable intention, on the part of the owner, to permanently abandon his property to the specific public use. If they are equivocal, or do not clearly and plainly indicate his intention to permanently abandon the property to the public, they are not sufficient to establish a dedication. The intention to dedicate must clearly appear, though such intention may be shown by deed, by words, or acts. If by words, the words must be unequivocal, and without ambiguity. If by acts, they must be such acts as are inconsistent with any construction except the assent to such dedication.' "

The ultimate facts to be considered in relation to the doctrine of equitable estoppel are these: Before the Revells made any expenditure in the purchase of their lot, they knew the exact location of the division line and that fee title in the driveway was in the Church. At that time their knowledge of the history of the use of the driveway, and of the sources of further information, was as great if not greater than the Church's. They knew the Church asserted ownership and was in possession of the property, and that the Church had no greater knowledge than they as to the sufficiency of the facts to support their claim to an easement. The only thing they did not know as they proceeded was whether the Church was going to contest their claim. The Church knew that Dr. Revell understood that they asserted title up to the dividing fence. Because of a division of opinion in its membership as to the action such an institution should take in the circumstances, it was undecided as to the course it should follow. It sought no advantage of the

Revells. It did not believe the claim of easement to be valid, but hoped a disposition of the controversy could be effected without litigation. In these circumstances, the Church watched the Revells model valuable improvements necessitating a future use of the driveway in passing between the street and their garage, and stood silent until two years after the improvements were complete. The Revells admit that they were not influenced in their course by that which the Church did or failed to do. They depended solely on the advice of counsel.

 The doctrine of equitable estoppel is invoked by the courts to protect litigants from actual or constructive fraud. It is not available to a litigant as a shield from damage resulting from his unilateral uninfluenced errors of judgment. No case has been called to our attention, nor revealed by our study, where a party in possession of all of the facts, and uninfluenced by his adversary, has been permitted even in the best of good faith to make expenditures in the presence of that adversary in preparation for that which the law when applied to those facts would declare to be a trespass upon property owned and then in the possession of that adversary and claim the benefit of an equitable estoppel predicated on the failure of the owner to either assert his rights or warn that he intended to stand on his rights. A doctrine which seeks to accomplish no more than that which is fair between man and man has no function to perform in such circumstances. The Revells had no right to presume that the Church intended to bestow a valuable property right upon them, nor did they indulge in such a presumption, because Dr. Revell told the officers of the Church, in substance, "If you can prove I do not have an easement, I will buy an interest in your driveway." It is quite evident that although he believed in good faith that the facts known to both parties gave rise to a property right in the driveway, he proceeded in laying out his funds on the theory that if the Church took the initiative and proved that he "did not have an easement" he would buy a right or the title to their property. Having taken that course, he must

bear the loss occasioned by his error in judgment. He has no right to ask the courts to shift that burden to the Church.

From the aspect of one who asserts equitable estoppel its essential elements are three, viz., "(1) Lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party estopped; and (3) action based thereon of such a character as to change his position prejudicially." 19 Am. Jur. 643; Eickelberg v. Soper, 1 S. D. 563, 47 N. W. 953. See 19 Am. Jur. 343, § 498.

Neither of these elements are established by the record, and therefore the Church is not estopped.

In our opinion the evidence, not only supports, but impelled, the findings and conclusions of the learned trial court.

The judgment and order of the trial court is affirmed.

RUDOLPH, P.J., and ROBERTS and WARREN, JJ., concur.

POLLEY, J., took no part in the disposition of the case.