In Re VETTER'S ESTATE
VETTER, Appellant v. VETTER, Respondent
(66 N. W.2d 519)
(File No. 9438. Opinion filed November 6, 1954)

**Morgan & Neumayr,** Gettysburg, for Appellant.

**Kostboth & Frankhauser,** Gettysburg, and **Fred J. Homeyer,** Selby, for Respondent.

SMITH, P. J. In circumstances we shall presently describe, the late A. W. Vetter made a will whereby he devised and bequeathed his entire estate to his mother, Jeannie Vetter, and wherein he declared as follows:

> "I have intentionally ommitted to provide for, and specifically direct and will, that under no circumstances shall any part, share or interest in my estate go to, vest in, or be taken by my wife, Mildred A. Vetter."

By this instrument he nominated his mother as executrix and she petitioned to have it admitted to probate. Pursuant to SDC 35.03 the widow appeared and filed her written grounds of opposition to the probate thereof. The contest was heard in county court, and on appeal was tried de novo in circuit court. Both courts entered judgment admitting the will to probate. The widow has appealed.

The first contention of the widow is that, having been omitted from her husband's will, she is entitled to elect to take the share to which she would have succeeded had he died intestate. Under this view, because the estate was of a value of less than $50,000, she would succeed to the entire estate. Cf. SDC 56.0104 as amended by Ch. 456, Laws 1953. On this ground, the widow opposes the probate of this instrument.

The validity of the instrument offered for probate is the sole issue before the court in the contest of a will. SDC 35.0301. The only judgment the court is authorized to enter is one "either admitting the will to probate or reject-

ing it." SDC 35.0302. Irwin v. Lattin, 29 S.D. 1, 135 N.W. 759. An instrument, such as the one under consideration, which nominates an executrix who is willing to act must be admitted to probate, even though it does not effectively dispose of any of the property of the testator. In re Vasgaard's Estate, 62 S.D. 421, 253 N.W. 453. Thus it is manifest that this contention of the widow was not determinative of the issue before the court. The will must be admitted to probate whether the asserted right of election does or does not exist. Therefore, we hold that this contention should not be ruled.

 The second contention of the widow is that the will is fraudulent and therefore void. She assails it as in fraud of her marital rights and of creditors.

There can be no fraud where no right is invaded. Newman v. Dore, 275 N.Y. 371, 9 N.E.2d 966, 112 A.L.R. 643. Because we are of the opinion that the will invades no right of the widow, we hold this contention untenable.

The widow does not claim a contractual right in the property of the decedent; therefore, we look at our statutes. Neither husband nor wife has any interest in the property of the other, excepting their respective rights for support as specifically provided by law. SDC 14.0203. The only specific provision for support of a wife and children after the death of the husband is made by SDC 35.13 dealing with the homestead, exemptions and allowances. No estate in dower is allotted to the wife upon the death of her husband. SDC 14.0206 and 56.0103. The provision for succession to the property of a husband by a wife is qualified by the words "When any person having title to any estate not otherwise limited by marriage contract, **dies without disposing of the estate by will,** it is succeeded to and must be distributed * * * in the following manner: * * *." SDC 56.0104. The right of a husband to make a will **disposing of property to which his widow might succeed** is declared by SDC 56.0204. It is further provided that "Subject to right of occupancy of a homestead, every person over the age of eighteen years, of sound mind, may execute a will, and may thereby **dispose of all or any part of his estate, real or personal.**" SDC 56.0202.

Subject to the right of occupancy of the widow the husband may dispose of the homestead by will. SDC 51.1718. Of impelling significance is the provision that "If after making a will, the testator marries, and the wife survives the testator, the will is revoked, unless provision has been made for her by marriage contract, or unless she is provided for in the will, or **in such way mentioned therein as to show an intention not to make such provision;** * * *." SDC 56.0223.

Counsel for the widow urges the common law upon us as the foundation of the widow's rights in the property of the decedent. When the code speaks, the common law vanishes. Everett v. Buchanan, 2 Dak. 249, 6 N.W. 439, 8 N.W. 31; SDC 65.0202(1) and 65.0103. By words so unambiguous as to leave no room for construction the cited statutes declare that a wife has no right in the property of her husband except for such support as the law specifically provides. SDC 14.0203. The only support for which the law makes provision out of the property of a deceased husband is described in SDC 35.13 dealing with the homestead, exemptions and allowances. This will does not trench upon her right to the provision made for her by those statutes. Just as clearly the statutes provide that the husband may dispose by will of every estate and interest in real and personal property to which his widow might succeed. SDC 56.0204. That the foregoing was the meaning the lawmakers intended to express is confirmed by other provisions to which we have made reference supra. It follows that in making this will the husband but exercised his statutory privilege, cf. Anderson v. Anderson, 70 S.D. 165, 16 N.W.2d 43, and in so doing he invaded no right of his wife. Hence, the contention that the will is fraudulent is not maintainable.

Finally, we come to the contention of the widow that the will is the product of undue influence. The facts upon which this contention is founded were established by evidence almost without conflict.

The husband and wife were married in December 1940. He was then 43 and had not previously married. She had two daughters then aged ten and eight years by a previous marriage. Although her daughters were not adopted by the

husband they assumed his name. The life of the family prior to the time they moved to Gettysburg in 1946 is not significant. The husband acquired some land near Gettysburg which he farmed. He also carried on some small business ventures in town in which the wife assisted. The wife also accepted employment part of the time.. Four adjoining lots in Gettysburg were acquired in the name of the wife in 1947. They first built the family home on one lot and later erected a smaller dwelling on another of the lots. From the time they came to Gettysburg his aged mother lived near them and was in their home a good deal. She first lived in an adjoining apartment and subsequently in the above mentioned smaller dwelling. The husband was solicitous of his mother's welfare and made regular daily visits to her home. Prior to their life at Gettysburg the family had been congenial. After that time disharmony developed. The differences between the husband and wife arose over the claimed lax discipline by the wife of her daughters and their attendance at the State University, and over the title to the four city lots. In 1951 he requested a conveyance of that property and the wife refused to convey it to him. Thereafter he left the family home and moved in with his mother. While he was living with his mother he went unaccompanied to a lawyer's office and made the will in question. About that time he told a friend he was unhappy and wished he had never married. The contestant called her sister as a witness. She testified to a conversation with the husband on Thanksgiving in 1951 as follows: "So I went into the other room and I sat and Albert began telling me he was having some trouble with Mildred over Phyllis going to school and he then said, 'I am getting all fed up with it. I have made a Will and I have left everything to mother' and I said 'Albert, I don't know what you want me to do about it. I don't want to interfere between husband and wife; I know that Mildred is going to deed the house back to you, because she told me that she was. And I don't know anything I can do about it and I think if Phyllis was left out of your business you and Mildred would get along just fine.' "

Subsequently the wife conceded to his request and conveyed the city property to him. He returned to the family

home and life continued about as before. In 1952 the husband, wife, and mother made a trip to California and lived together in a trailer while there, and in the smaller Gettysburg dwelling for a time upon their return.

At the time the will was made, on November 5, 1951, the husband was in normal health, and seemed to be in good health thereafter. In May 1953 he suffered a heart attack from which he appeared to have recovered. In July 1953 he died following such an attack. At the time of his death property stood in his name of the value of over $26,000.

From the time he returned home some disharmony continued between the husband and wife. In fact at the time of the final heart attack, he was wrought up over a discussion of the conduct of the daughter Phyllis.

Some attempt was made to prove that the family discord was caused by the mother. She admitted she had complained to her son about the conduct of Phyllis, but there is evidence that she had a warm affection for both girls. The evidence is conflicting with reference to the mother's knowledge of the will and of its provisions. She denied any such knowledge; the wife's sister testified that the above quoted conversation with the husband took place in the presence of the mother.

At the close of the testimony the trial court directed a verdict for defendant, discharged the jury, and made findings and conclusions sustaining the will including a finding that the deceased was not "acting under the undue influence, duress, menace or fraud of the said Jeannie Vetter," when he made the will, and "That the terms and conditions of the Last Will and Testament of A. W. Vetter * * * were the result of the free and voluntary act of the testator, and were caused by and resulted from the domestic disputes and differences between the said testator and the contestant herein."

The principles which have governed us in the consideration of this final contention have so lately been the subject of an elaborate opinion we are not justified in reproducing them here. Cf. In re Rowlands' Estate, 70 S.D. 419, 18 N.W. 2d 290.

Based principally on the unnatural and unjust character

of this will but stressing also such other circumstances as the very close relationship between husband and his aged mother,—which counsel characterizes as a mother complex, —the opportunity afforded the mother to exercise her influence about the time the will was made, her alleged false denial of any knowledge of the will or its terms, and her apparent willingness to take all of this substantial estate and leave her son's widow without adequate provision for her support, the widow contends that the weight of the evidence is against the quoted findings of the court. These emphasized circumstances are not without weight, but when they are viewed in connection with the whole evidence, they fail to persuade us that a clear preponderance of the evidence is against the findings of the trial court. It is our view that its findings are impelled by the whole evidence.

Counsel for the widow predicates his argument on this issue upon the language of this court in Johnson v. Shaver, 41 S.D. 585, at page 594, 172 N.W. 676, at page 678, as follows:

"* * * where the will contains unjust or unnatural provisions, it demands close judicial scrutiny; the onus devolves upon the proponent to prove a reasonable explanation of the unnatural character of the will; there must be fair proof that the testator had mental capacity to comprehend its import; and the court must, from all the evidence, be led to believe that undue influence did not produce the unjust or unatural disposition."

In re Johnson v. Shaver, supra, and again in In re Rowlands' Estate, supra, this court pointed out that the fact a will makes an unjust or unnatural disposition of property of the testator is but a circumstance for the trier of the fact to consider in connection with the whole evidence.

There is no direct evidence that this will resulted from undue influence. Its unnatural character is explained by a witness put forward by the contestant. Her sister testified that shortly after the will was made, the husband told her "* * * he was having some trouble with Mildred over Phyllis going to school" and "I am getting all fed up with it.

I have made a Will and I have left everything to my mother." Because of his feelings toward his wife, the husband made this will. Quite evidently, long months which intervened between its making and his death did not soften his feelings. We cannot commend his action, but we cannot deny that he was privileged so to act.

The judgment of the trial court is affirmed.

All the Judges concur.