REICHERT, Appellant v. REICHERT et al., Respondents

(90 N.W.2d 403)

(File No. 9686. Opinion filed June 5, 1958)

**G. F. Johnson,** Gregory, for Plaintiff and Appellant.

**M. E. Miller,** Lake Andes, **Wm. C. Grady,** Bonesteel, for Defendant and Respondent Alvin Clocker.

BOGUE, J. Plaintiff brings this action to quiet the

title to an undivided one-sixth interest in certain real property and for a partition thereof.

The plaintiff and the defendants other than Clocker are brothers and sister. They inherited Lot 30, Sec. 33-95-67 from their father, each owning an undivided one-sixth thereof. In September of 1941 the plaintiff and these defendants with the exception of Frank Reichert, who could not be located, executed a quitclaim deed purporting to convey their interest in the above described property to the defendant Jacob Reichert, known as Jake. This deed appears on its face to effect a complete and absolute conveyance. This was apparently done for convenience in handling the land and there was no intent on the part of the grantors to relinquish their interest therein. This quitclaim deed was not recorded until March 27, 1954. Plaintiff lived on the farm as a tenant from the time of his father's death until he was removed by defendant Clocker. Apparently the plaintiff's brothers and sister claim that he owes to them rentals for his use of this land, which plaintiff disputes.

An agreement was made between the brothers and sister that they would sell the farm which consisted of the property herein described together with certain land in Nebraska in the event that $9,600 could be obtained therefor. Plaintiff inserted an ad in the Bonesteel paper offering the land for sale. The record is silent as to what the ad stated. Clocker pursuant to this ad contacted plaintiff and offered the sum of $10,000. Plaintiff then informed Clocker that he would write to the heirs. Clocker then talked to Jake as he had been informed that Jake was the person having authority to deal with this land. Jake then contacted his brothers and sister, including Frank, concerning the sale. Thereafter Jake informed Clocker that he had heard from the Reichert heirs and it was all right to go ahead and close the deal.

On March 15, 1954, Clocker and his wife together with plaintiff and Jake drove to Bonesteel for the express purpose of consummating the sale of the land. There they contacted an attorney suggested by plaintiff. This attorney is not representing any of the parties in this action. Apparently

most of the matters relating to the sale had been agreed on. However, the time of possession by Clocker evidently had not been definitely determined. Clocker claims that this was the reason plaintiff went to the attorney's office with them. The matter of possession was talked over in the attorney's office. It is apparent that plaintiff did not definitely agree to move immediately as the contract contains two alternates in the event possession could not be delivered within 30 days. The first alternate provides that if it became necessary to execute a lease with plaintiff or anyone else, Clocker was to pay $9,650. The second alternate provides that if possession could not be obtained until January 1, 1955, Clocker was to pay only $9,000. The record is silent as to the actual participation of the parties in the discussion, but it must be assumed that all present including plaintiff participated therein.

Plaintiff, at this meeting, produced the abstracts which he had in his possession. The attorney was familiar with the title and with the deed of September 1941. At this time he assured Clocker that the title was in good shape. The contract of sale was then prepared, Jake and his brother Frank being designated therein as owners. The contract was read aloud by the attorney and signed by Jake and Clocker. Plaintiff then asked who was going to farm the place for that year. The attorney stated that he didn't know who would farm the place, that plaintiff was not a required party to the contract as he had already signed away his interest. There is a conflict in the testimony as to just what plaintiff did say in response to the attorney's statement. Clocker testified that he stated "He said it wasn't his contract. I forget the words used, it wasn't his contract or something like that." Mrs. Clocker claimed he said, "If there isn't anything for me to do I just as well leave and he got up and left." The attorney testified plaintiff said, "Well I think he said there's nothing more for me to do here or something like that and he got up and left." Plaintiff insists that he said "That's your contract, that ain't mine." It is undisputed, however, that after making a statement he walked out of the attorney's office.

On April 5, 1954, Jake and his brother Frank and the Clockers met in the attorney's office. At that time a further

agreement was entered into, signed by Jake, Frank and Clocker, which provided that $1,000 of the purchase price was to be held back by Clocker pending the obtaining of possession from plaintiff. On the same date deeds were executed by Jake and Frank and delivered to Clocker purporting to convey the property before described. Clocker thereupon paid the balance of the purchase price with the exception of the $1,000.

The record does not disclose the conduct of any of the parties involved in this action from April 5, 1954 until the commencement of this action with the exception of the removal of plaintiff from the premises by Clocker.

The trial court specifically found that plaintiff was an active participant in offering the land for sale; that Clocker knew that plaintiff was in possession of the premises but believed that Jake and Frank were the owners of the land and the only interest of plaintiff was that of a tenant holding over after the expiration of his term; that plaintiff knew that this was the belief and understanding of Clocker and further knew that Clocker was entering into the contract in reliance upon such belief; that plaintiff during the precontract negotiations, during its preparation, at the time it was read, or at any time subsequent while such contract remained unperformed by Clocker, made no claim of any ownership or any interest in the land nor did he in any manner object to the sale to Clocker. From its findings the court concluded as a matter of law that plaintiff was estopped from claiming any interest in the land adverse to Clocker.

■ The plaintiff makes only one assignment of error, this being that the evidence is insufficient to support the decision and judgment of the court. The particulars of the insufficiency of the evidence as pointed out in the assignment of error pertain primarily to matters relating to notice on the part of Clocker as to plaintiff's interest in the land. Plaintiff's brief is chiefly devoted to this same matter. Clocker, however, in his brief specifically makes the following statements: "The evidence as a whole shows that Clocker recognized the fact that Joe owned or claimed some kind of an interest in the land, in addition to his rights as a

tenant" and "Clocker at the time of the meeting knew Joe had an interest, * * *". We thus have presented to us the anomalous situation of an admission as to a controverted issue which is contrary to the express finding of the trial court. This admission is binding on Clocker. 5 C.J.S. Appeal and Error § 1343; Benson & Marxer v. Reger, 186 Iowa 19, 168 N.W. 881, 172 N.W. 166; Sova v. Ries, 226 Wis. 53, 276 N.W. 111. We must, therefore, review this case as if Clocker had actual knowledge of plaintiff's interest in the land at the time of his purchase thereof.

The pre-trial order states that Clocker agreed that plaintiff immediately prior to the sale to Clocker was the owner of an equitable one-sixth interest in the land. The parties to this action apparently agreed that by reason of the deed of September 1941, Jake acquired the legal title and his brothers and sister retained an equitable interest therein. It appears they believed that Jake held the land in trust for the benefit of his brothers and sister. No questions have been raised on this appeal as to the creation or existence of this trust, so none will be considered by us. Jake, as trustee, had the apparent authority by the deed of September 1941 to sell the land. Further, the beneficiaries of the trust had, according to Jake, given their express consent to this particular sale. Clocker had knowledge of said deed, had been informed of the beneficiaries' consent, and claims to have relied thereon, in his purchase of this land.

The trial court by its findings construed the conduct of the plaintiff in the attorney's office in Bonesteel to mean that the plaintiff in no manner objected to the sale during any pre-contract negotiations during its preparation, at the time it was read or at any subsequent time while such contract remained unperformed by Clocker. We are of the opinion this finding is amply sustained by the evidence.

Thus, we have this situation presented to us. Is a beneficiary of a trust who has clothed the trustee with the legal title and the apparent power to sell, has actively participated in the sale, was present when the contract of sale was executed, made no objection to the sale and from his conduct led the purchaser of the property to believe that the

trustee had the full and complete power to sell, estopped from claiming his beneficial interest in the property, where the purchaser knew of the beneficiary's interest when he entered into the contract to purchase the land? This court in the case of Tolerton & Stetson Co. v. Casperson, 7 S.D. 206, 63 N.W. 908, 910, set out the principles of equitable estoppel as follows:

"The law of an estoppel **in pais** is well settled, and is thus stated by the supreme court of the United States in Dickerson v. Colgrove, 100 U.S. 578, 25 L.Ed. 618: 'The vital principle is that he who, by his language or conduct, leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted. Such a change of position is strictly forbidden. It involves fraud and falsehood, and the law abhors both. This remedy is always so applied as to promote the ends of justice. It is available only for protection, and cannot be used as a weapon of assault. It accomplishes that which ought to be done between man and man, and is not permitted to go beyond this limit. * * *' "

In the case of First Church of Christ, Scientist v. Revell, 68 S.D. 377, 2 N.W.2d 674, 678, we defined the essential elements of equitable estoppel from the aspect of the one asserting it as follows:

" '(1) Lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party estopped; and (3) action based thereon of such a character as to change his position prejudicially.' "

It appears, therefore, that plaintiff would be estopped if Clocker had lacked the knowledge or means of knowledge of plaintiff's interest in this property at the time of the sale. See also 50 A.L.R. 668; 31 C.J.S. Estoppel § 90; 19 Am.Jur., Estoppel, § 91. Does the fact that Clocker knew of plaintiff's interest in this property at the time of his purchase thereof prevent Clocker from now asserting that plaintiff is estopped

from claiming such interest? Clocker cannot claim to be an innocent purchaser. However, this in itself would not necessarily prevent him from asserting estoppel. Johnson v. Becker, 251 Mich. 132, 231 N.W. 96. The test to be applied here is whether or not there can be a lack of knowledge or means of knowledge as to the truth of the facts in question on the part of Clocker where he has knowledge of plaintiff's interest in the property.

It is apparent that from the conduct of plaintiff, the statements made by their mutual attorney, the execution and delivery of the deed of September 1941 to Jake, and the information received by Clocker during the sale negotiations that Clocker believed plaintiff had surrendered his legal title and his rights to sell his equitable interest to Jake, thus giving Jake full authority to sell the land. The owner of a known right or title can be estopped to assert his title or right under these circumstances. In 19 Am.Jur., Estoppel, § 86, p. 741, the following statement in regard thereto is found: "For example, the owner of a known right or title may by his representations, acts or silence so lead another to act in the belief that the owner has waived, surrendered, or abandoned his right or title that he will be estopped from asserting it to the injury of him who has changed his position in reliance upon the owner's representations, acts, or silence."

The fact in question, therefore, that Clocker relied upon and acted upon here was not plaintiff's interest in this property but Jake's apparent power to sell it. The plaintiff knew that Clocker was purchasing this property under the belief that plaintiff had surrendered his title and rights therein to Jake. Thus, if plaintiff for any reason changed his mind about the sale, and desired to withdraw the apparent authority which he had given to Jake, it was his duty to have informed Clocker of this fact. 19 Am.Jur., Estoppel, § 55. By reason of plaintiff's failure to so inform him, Clocker lacked any knowledge or means of knowledge that plaintiff wished to proceed in any manner inconsistent with the apparent powers of Jake.

We are of the opinion that each of the essential elements

of estoppel as defined in the case of First Church of Christ, Scientist v. Revell, supra, is present in this case. The plaintiff is thus estopped from claiming any interest in the land in question adverse to Clocker.

The judgment is affirmed.

All the Judges concur.