NORTHWEST REALTY COMPANY, Respondent
v.
COLLING and JESSE, Appellant

(147 N.W.2d 675)

(File No. 10296. Opinion filed December 29, 1966)
Rehearing denied March 2, 1967

**Gunderson, Farrar, Carrell & Aldrich,** Rapid City, for defendant and appellant, Raymond Jesse.

**Dana, Golden, Moore & Rasmussen,** Sioux Falls, for plaintiff and respondent, Northwest Realty Co.

**Mundt & Weisensee,** Sioux Falls, for defendant and respondent, Edward C. Colling.

HOMEYER, Judge.

This is an equitable action for strict foreclosure of an executory contract for the sale of real estate and personal property which includes the Valley-Hi Country Club near Rapid City. Foreclosure was decreed and one of two named defendants appeals. Plaintiff-respondent, Northwest Realty Company, is named as vendor in such contract and at all times material herein, it was represented by Sheldon F. Reese, its president and managing officer. For brevity and simplicity we will refer to plaintiff-respondent as Reese; defendant-respondent, Edward C. Colling, the vendee named in the contract, as Colling; and the defendant-appellant, Raymond Jesse, as Jesse.

The complaint alleges the execution of the contract by Reese and Colling and a purported assignment thereof to Jesse; that Reese is ready, willing and able to perform; that default exists in the payment required to be made on January 2, 1964 and that in accord with the contract, Reese has declared the full amount due and payable; that payment has been demanded and unless made, Reese elects to cancel and terminate the contract. The prayer for relief among other things asks the court under its statutory authority to equitably adjust all rights of the parties and to determine the respective interests of Colling and Jesse, and allow them, or either of them, time to perform and absolve themselves from default.

The answer of Jesse alleges an equitable estoppel to prevent Reese from pursuing his remedy of strict foreclosure unless he pays amounts deposited in escrow by Jesse and used to improve the property. He also counterclaims against plaintiff and cross claims against Colling for damages, actual and exemplary, for fraud and deceit.[1] The answer of Colling alleges an accord

---

1. On Jesse's motion Sheldon F. Reese individually, Carl T. Burgess, Richard M. Bielski, the Burgess and Bielski Investment Company, Inc., and James Schumacher were brought into the action as additional defendants and the cross claim was also against them. On their motion before trial the court dismissed the cross claim against the defendants, Carl T. Burgess and James Schumacher. During trial, the cross claim against the defendants, Sheldon F. Reese, Richard M. Bielski, and the Burgess and Bielski Investment Company, Inc. was dismissed on Jesse's motion.

and satisfaction between Colling and Jesse and also a cross claim for damages against Jesse.

The trial court found against Jesse on the issues of estoppel and damages for fraud. It also found an accord and satisfaction between Colling and Jesse and fixed the interests of Colling and Jesse in the property to correspond with their accord and satisfaction. Time for complying with the terms of the contract was fixed for Colling first and then for Jesse if Colling failed to comply on default in payment of taxes and insurance and also in payment of principal and interest. No payments were made by either defendant and the judgment of foreclosure became final as provided by SDC 1960 Supp. 37.3101.

With some lack of clarity in the assignments of error we believe the prime question presented is whether the evidence when considered in its entirety will support the court's finding of no equitable estoppel and no fraud.

These factual determinations were required to be made by the trial court from an involved and somewhat bizzarre chain of events and circumstances which we will only summarize. Much of the evidence is documentary and undisputed. Very little conflict exists as to what transpired. The subject property consists primarily of 318 acres of real estate and a nine-hole golf course is located on an 80 acre tract thereof. A club house is situated thereon and the contract also covers the equipment and furnishings to operate the golf course and club house. The property originally belonged to the Jolly Acres Country Club, a private corporation, which had encountered financial difficulty in its operation.

During the summer of 1962 Reese was in the process of foreclosing liens which he held on the subject property and perfecting his title thereto when Colling who lived at Scottsbluff, Nebraska and termed his occupation as oil and promotional work, became interested in the property. Originally it appears he was promised a large commission by one Carmella Rankin, who purported to be representing some of the larger stockholders of Jolly Acres, if he was able to sell the property, and she had

given him some form of document setting forth the arrangement. Colling was also engaged in selling farm and ranch buildings and had an earlier limited acquaintance with Jesse, a rancher from near Antioch, Nebraska, to whom he had attempted to sell a machine shed a few months before.

About June 21, 1962, Colling saw Jesse and told him for an advance of $40,000 he would erect the building valued at $33,000 on his ranch and repay the $40,000 within one year. Jesse was shown pictures of the property and the document Mrs. Rankin had given him. The matter was discussed with Jesse's banker and the bank made a loan of $40,000 to Jesse who turned the money over to Colling. In return, Colling gave Jesse a paid-up contract for the machine shed to be erected on Jesse's ranch by June 21, 1963 and a letter[2] above his notarized signature describing the transaction.

Subsequently Jesse showed these documents to his then lawyer, Stubbs, who was dubious of their value and he recommended a trip to Rapid City to investigate. On July 13, 1962, Jesse looked at the property, checked the courthouse records thereon, and ascertained that Reese had considerable money invested therein and that such property was in the process of foreclosure. He contacted Reese and showed him the documents he had obtained from Colling and permitted Reese to make copies. Reese warned Jesse against dealing with Mrs. Rankin and Colling and asked him if he wanted help in getting his money back. Reese also attempted to telephone Jesse's attorney at Alliance, Nebraska, but could not reach him. Before parting Reese advised Jesse not to discuss the matter with anyone except his attorney. The following day Jesse contacted Colling and told him of his meeting and conversation with Reese and Colling recommended that he stay away from Reese because if Reese thought Jesse was pressuring Colling he might raise the price on the property. The record reflects no further contacts between Reese and Jesse

2. Copy of letter from Colling to Jesse. "For the sum of $40,000 you have given me today, you have received a paid contract for a 80' x 180' x 12' building to be erected on your place. You are also to receive $40,000.00 of the $120,000.00 fee which is coming to me for the refinancing of the Jolly Acres Country Club of Rapid City, South Dakota. In the event that fee is not earned and paid, you will receive 2/3 of all money received from the sale of our equity in houses, lots and liquor license to the amount of $40,000.00."

until either the latter part of March or the early part of April 1963. Colling and Jesse had infrequent telephone conversations during the summer of 1962 as to his progress on the sale or refinancing of Jolly Acres in which Colling indicated that he felt he could deal with Reese if he was unsuccessful in dealing with the stockholders of Jolly Acres.[3]

In early September 1962 Colling contacted Reese for an option on the property and on September 5, 1962, Reese wrote a letter which states that his attorney has been instructed to prepare an option.[4] The written option was executed on September 14, 1962 and incorporated substantially the terms specified in the letter. In late September Colling approached Jesse for the $25,000 payment required by the option.[5] On October 30, 1962, Colling obtained another option[6] from Reese which was in much greater detail and recited that it amended and superseded the option of September 14th. On December 6, 1962, Colling entered into a Lease Agreement with the Burgess & Bielski Investment Co. Inc., for a period of five years beginning April 1, 1963 with an option to renew for an additional ten-year period. The lease covered the 80 acres on which the golf course was located to-

---

3. The evidence shows Colling made some effort to acquire the interests of the stockholders of the defunct Jolly Acres Country Club, but could not obtain some of the larger interests. Apparently had he been able to acquire such interests, he contemplated redeeming from the foreclosure and settling with other lienholders and creditors.

4. The letter specified a sale price of $234,050 and a payment of $25,000 on or before October 1, 1962 with the balance when quiet title proceedings were completed, or $50,000 and the balance within 90 days after title was quieted. An action to quiet title and to determine adverse claims had been commenced on August 29, 1962. On October 24, 1962, judgment was entered against defendants in default, but the action was continued as to two lien claimants and the United States government which had appeared.

5. Jesse testified: "But the contract (option of September 14, 1962) required the full payment in a short time and I wasn't interested in that deal * * * so I talked to my attorney, Mr. Stubbs." Stubbs warned against any further investment and disapproved the June 21, 1962 documents. See Note 2. Jesse also testified that at that time he inquired about the initial $40,000 and was told he had given $7,000 to his attorney, Mr. Bielski, and $6,000 to Mrs. Rankin, but "didn't get any information about the other part of it."

6. The October 30th "Agreement" (it was signed by both parties) required a payment of $12,500 upon execution and a sale price of $239,050.00; $26,550 by December 1, 1962, or when the quiet title proceedings were completed and provided for an escrow deposit of $50,000 by January 1, 1963, to be used to make improvements on the property at which time a Contract for Deed was to be executed. It also provided that there should be added to the sale price sums expended by Reese for improvements since September 5, 1962, and the cost of settling undisposed of liens in the quiet title proceedings not to exceed $5,000.00. The court found the cost of such improvements and expenditures to be $10,056.91, or a deferred balance of $210,056.91. This sum with 6% interest was to be paid in three equal annual installments commencing January 2, 1964. It required the purchaser to pay the 1962 taxes due on January 1, 1963, and to procure insurance when possession was taken which was to be upon execution of the Contract for Deed. The option contemplated a lease of the golf course portion and required the seller's approval. It also required the seller's approval on sales of any portion of the property to "protect the security".

gether with equipment and the lessor before the beginning of the lease period agreed to remodel and refurnish the club house and to construct an enclosed heated swimming pool at a cost of not to exceed $75,000.[7] Shortly after the date of such lease Colling again contacted Jesse and showed him the October 30th option and the December 6th lease. He also told him that he had paid the sum of $39,050.00 required by the option and expressed satisfaction in securing Burgess as the lessee of the golf course property. Jesse was given copies of the agreements and he took them to his lawyer, Mr. Harris,[8] and they all subsequently met with Jesse's banker[9] who made some telephone calls to Rapid City and Pierre concerning Burgess. Jesse also made a trip to Rapid City where he met Mr. and Mrs. Burgess and inspected their operations at Pactola Lodge. On December 19, 1962, Jesse and Colling entered an agreement prepared by Harris reciting the initial advance of $40,000 and an additional escrow advance of $50,000 and Jesse took an assignment of the rentals under the lease.[10]

On January 2, 1963 Reese and Colling entered into a contract for deed which complies substantially with the provisions

---

7. The Lease Agreement provided for improvements at the expense of the lessor according to plans and specifications furnished by the lessee, except as to the swimming pool on which they were to mutually agree. The swimming pool was to be completed during the spring of 1963 for use during that summer. Colling was to receive as rental 35% of membership fees and annual dues specified in the lease plus 6% of gross sales. The lease contemplated 300 full memberships of $250 each with annual dues of $120; 500 social memberships within a radius of 50 miles at $100 each and dues of $60; and 200 social memberships outside such radius of $25 each with dues of $48. On February 24, 1963, the Lease was amended to 15-year term, commencing April 1, 1963 and the Lessee was to sell not less than 500 full memberships of $150 each and annual dues of $240; 2000 social memberships within a 50 mile radius of $50 each and annual dues of $60; and 200 social memberships of $25 each outside such radius.

8. Jesse had changed lawyers because of a personality conflict between his first lawyer, Stubbs, and Colling.

9. Sudman, the banker, recommended against further investment, but left the decision to Jesse since he would have to pay the money back. Jesse testified: "I told him (Sudman) that I thought it would make my $40,000 solid * * *"

10. The December 19, 1962, agreement reaffirmed Colling's obligation for the machine shed without cost to Jesse; it also permitted Jesse to select 20 acres outside the golf course tract to be conveyed on or before May 15, 1963; and assigned the first $40,000 in rentals to Jesse. If additional advances were made, Jesse was to receive an additional acre of ground for each $750 advanced. Although it is not too clear it appears the 20 acres was to be conveyed to Jesse as the consideration for $50,000 escrow advance. The April 10, 1963 Escrow and Option Agreement between Jesse and Colling refers to a letter from Jesse's attorney to Colling on February 20, 1963 selecting the acreage or if conveyance was not made, an additional assignment of rentals to the extent of $60,000. From June 1963 to October 1963 Jesse collected rentals from the lessee totaling $11,040.60 under this assignment.

of the October 30th option.[11] On December 27, 1962, Colling and Burgess had entered into an Escrow Agreement involving monies to be used in refurnishing and improving the golf course and club house as required by the lease. Reese approved the Escrow Agreement.[12]

On January 18, 1963 Reese approved the lease of the premises to the Burgess and Bielski Investment Co. Inc., although he testified that he did not consider it a good lease particularly because it provided no minimum rent and no time limit on when the memberships were to be sold.[13] By an Agreement dated January 19, 1963, he required Burgess and Bielski as individuals to acknowledge that their lease would be void if Colling or his assigns failed to make the payments in the contract for deed. The same instrument provided that if such default occurred they would purchase the property for the amount which remained unpaid on the contract plus costs of foreclosure. Reese said he told Colling of this agreement shortly after it was executed, but Colling disclaimed knowledge thereof until about August 1964. Jesse was informed of this Agreement before April 10, 1963.

On or about April 10, 1963 after numerous conferences and preliminary negotiations an Escrow and Option Agreement was executed by Colling and Jesse and approved by Reese and the lessee. The agreement was prepared by Jesse's lawyer with some changes and additions made prior to its execution. It referred to prior documents involving the property, most of which

11. See note 6, supra. The Contract for Deed permitted sales of portions of the property with the vendor's approval if the same did not impair the security and if 2/3 of the purchase price was used to reduce the contract indebtedness. If the payments were not made and title reverted to the vendor, it would include "all additions, improvements, furnishings and equipment placed upon said premises by Colling or purchased with the $50,000.00 deposited in said escrow account * * *". It required any lease by Colling of the property to be presented to Reese forthwith for consideration and approval in writing and was not to be binding on Reese until such written approval. The vendee had the right to prepay all or any portion of unpaid principal, with accrued interest at any time without penalty.

12. The Escrow Agreement recognizes the commitment to spend not only $50,000, "but an additional $25,000.00, if necessary" under the December 6, 1962 lease. The $50,000 was to be deposited in the First National Bank of the Black Hills at Rapid City in a trust account of Northwest Realty Company to be withdrawn only by Burgess to pay for furnishings and improvements and portion not used to remain the property of Colling. Burgess was to submit plans and cost figures on improvements to Reese and Colling.

13. In his written approval of the Lease, Reese specifically recited that it was effective only so long as Colling, or his duly approved assignee shall make the payments and perform the conditions of the Contract for Deed and that it was not to be construed as a grant by Reese to the lessee or any other interest in the contract properties.

we have referred to. It provided for a quit-claim deed and as-signment of Colling's interest to Jesse to be deposited in escrow and delivered to Jesse if certain sums and additional advances were not repaid by August 1, 1963.[14] It also provided that the additional advance by Jesse in an amount not to exceed $107,140 was to be placed in an escrow account and used for further equipment and improvements on the property under the direc-tion of the lessee.[15] It also gave Jesse a power of attorney over the property.

On June 11, 1963 Burgess and Bielski wrote Jesse offering to buy the 80 acre tract on which the golf course was located and the equipment and an additional 70 acres of abutting land for $400,500.[16] On August 8, 1963 Jesse replied to this letter and called attention to the April 10th escrow and option agreement and the failure of Colling to meet the conditions thereof and set forth that Jesse's ownership of Colling's interest in the property was now complete. It also mentioned some controversy between Colling and Jesse on delivery of the documents held in escrow. The letter contained the following paragraph:

"As you are aware, a payment to Northwest Realty Company is due on 2 January 1964. Unless other long-term financing arrangements are made, I plan to make this payment on time. I have always met my obligations when they were due in the past and I will do so in the future."

It also expressed concern that the expenditures for equipment and improvements had exceeded $107,140 and stated "Mr. Reese has advised me that he feels it best to keep in strict compliance with the contract." A copy of the letter was mailed to Sheldon

---

14. To defeat delivery of the documents held in escrow to Jesse (quitclaim deed and assignment), Colling was required before August 1, 1963, to (1) repay Jesse $107,140 with 6% interest from April 10, 1963; (2) erect machine shed, see note 2 supra; (3) repay $40,000. (This was the initial advance, see note 2, for which the lease rentals were assigned on December 27, 1963 to assure repayment) (4) convey 20 acres selected by Jesse, or $60,000, in additional rentals. See note 10.

15. Attached to the Escrow and Option Agreement was a list of the items with estimates of cost totaling $107,140 for which the money was to be used.

16. The purchase price with 6% interest was to be amortized over ten years with monthly payments. Bielski and Burgess did not send a copy of this letter to Colling. Neither did Jesse inform him thereof. Colling apparently had no knowledge of this letter until sometime after this litigation began.

F. Reese, c/o N. W. Realty Co. On July 24th Bielski had wired Colling that the sums expended for equipment and improvements had exceeded the sum specified by more than $50,000 and he estimated future cost of additional work and equipment in excess of $20,000.[17]

■■ The trial court properly found there was no basis for an equitable estoppel to prohibit plaintiff-respondent from proceeding with strict foreclosure. The doctrine of equitable estoppel is sometimes invoked by the courts to protect litigants from actual or constructive fraud, but "It is not available to a litigant as a shield from damage resulting from his unilateral uninfluenced errors of judgment." First Church of Christ, Scientist v. Revell, 68 S.D. 377, 2 N.W.2d 674. To create an estoppel there must have been some act or conduct by the party estopped which has in some manner misled the party in whose favor the estoppel is sought and has caused such party to part with something of value relying upon the party to be estopped. Somers v. Somers, 27 S.D. 500, 131 N.W. 1091, 36 L.R.A., N.S., 1024; Kelly v. Gram, 73 S.D. 11, 38 N.W.2d 460; 31 C.J.S. Estoppel § 94; 28 Am.Jur.2d, Estoppel & Waiver, § 112, pp. 769, 770.

■■ Courts will not declare an estoppel if a party making an improvement or expenditure does so in good faith with knowledge of the rights of the party against whom he later urges an estoppel. Estoppel cannot be invoked by one, who at the

17. Attached to the Answer of Burgess (see note 1) is a copy of an Agreement between Jesse, Colling, and Burgess dated November 7, 1963, which contemplated that Colling would make a loan of $350,000 from which Jesse was to receive (1) $100,000 (2) title to 65 acres of land clear of encumbrance (3) balance remaining on $40,000 of rentals assigned. Burgess was to supply proof of payment of about $56,000 in liens and accounts in excess of limitation in April 10, 1963 Agreement and was to receive title to 55 acres of land clear of encumbrance. From proceeds of loan, Colling was to pay Reese in full. The Agreement also stated: "The purpose hereof for the benefit of all parties to this contract is that there shall be available by January 2, 1964, a sufficient amount of money to pay all of the outstanding balances on the Northwest Realty contract to insure that clear title may be received by the respective parties * * *"

If Colling did not have a firm commitment of a loan on the property, except the 55 acres of Burgess, by December 1, 1963, Jesse was authorized to procure the loan.

Colling, Jesse, and Burgess were each represented by their own counsel when this Agreement was prepared and executed.

On November 26, 1963, Burgess wrote Colling: "Enclosed are signed releases from firms that had bills against Valley Hi. There are a few who have not returned the signed release, but, of course, I have cancelled checks. The figure of $56,000.00 was not a true picture as I have paid out over $59,000.00. In the event you wish to have the fifty-five (55) acres and are able to pick up the overages of $59,000.00 by February 1st, 1964, I will turn the land back to you. Ed, I sincerely hope you get the job done and that you make a million out of the property."

time he made improvements, was acquainted with the true character of his title or interest or with the fact that he had none. Snieders v. Brantsen, 245 Iowa 81, 60 N.W.2d 779. Annotation 76 A.L.R. 304, 310.

To constitute an equitable estoppel "false representations or concealment of material facts must exist; the party to whom it was made must have been without knowledge of the real facts; that representations or concealment must have been made with the intention that it should be acted upon; and the party to whom it was made must have relied thereon to his prejudice or injury." Cromwell v. Hosbrook, 81 S.D. 324, 134 N.W.2d 777.

The burden was upon Jesse to prove facts upon which to predicate an estoppel and this he failed to do. From the inception of this rather incredible transaction he was aware of its speculative nature and the hazard connected with his initial advance of $40,000. If not immediately so apprized, he so learned shortly afterwards when he went to Rapid City and visited with Reese whom he now claims defrauded him. Reese offered to help him get his money back; he attempted to call his lawyer; he warned him against Colling and others who appeared to be involved in the venture. Nevertheless, on his own volition and ignoring the advice of his regular lawyer, Stubbs, and his banker, he chose to make additional advances and loans each of which only served to more deeply entwine him. At nearly every stage of the transaction he was represented by counsel and many of the legal documents were prepared by his own lawyers. After his first advance to Colling he made independent investigations on the potential of his investment and closely pursued the purposes for which his money was being used.

At all times after the advance of $40,000, or more properly $7,000 since he received a paid-up contract for the erection of a machine shed on his ranch valued at $33,000, he was fully aware that the legal title to the subject property was in Reese and equitable title was in Colling or would be in him under a Contract for Deed to be executed on which a portion of the purchase price was unpaid.

We recently said: "The relationship between an installment vendor and his vendee is essentially that of secured creditor and debtor. The vendee for all practical purposes is the owner of the property, generally with the right of possession and use, and the vendor's sole remaining interest is to be paid the agreed consideration in the form and manner provided by the instrument used to secure payment thereof." Renner v. Crisman, 80 S.D. 532, 127 N.W.2d 717. The record is replete with credible substantial evidence showing recognition by Jesse of the nature of the security interest of Reese and the need to comply with the terms of the instrument providing such security to avert foreclosure.

Much of what we have said on equitable estoppel is equally applicable to support the trial court's determination that there was no fraud or deception. The doctrine of equitable estoppel evolves from fraud, either actual or constructive. See Kraft v. Corson County, 71 S.D. 382, 24 N.W.2d 643.

■ ■ Essential elements to establish actionable fraud are "generally speaking, that a representation was made as a statement of fact, which was untrue and known to be untrue by the party making it, or else recklessly made; that it was made with intent to deceive and for the purpose of inducing the other party to act upon it; and that he did in fact rely on it and was induced thereby to act to his injury or damage." 23 Am.Jur., Fraud and Deceit, § 20, p. 773. See Ward v. Dakota Telephone & Electric Company, 49 S.D. 135, 206 N.W. 695. There can be no fraud if there is no duty. In re Vetter's Estate, 75 S.D. 417, 66 N.W.2d 519.

■ ■ This court has repeatedly said that fraud is never presumed or lightly inferred and the burden of establishing fraud rests on the party who seeks to rely on it for affirmative relief or as a defense to an action. City of Vermillion v. Hugener, 75 S.D. 106, 59 N.W. 732; Breneman v. Aune, 73 S.D. 478, 44 N.W.2d 219. Direct and positive evidence is not always required and like other issues of fact in particular cases it may be established by inference from other facts and circumstances to the satisfaction of the trial judge. Funke v. Holland Furnace Company, 78 S.D. 374, 102 N.W.2d 668.

all remaining interest was vested in Colling. When these documents were executed a default existed under the contract and both Colling and Jesse had been notified of such default and of the vendor's intention to declare a forfeiture and terminate the contract if payment was not made within 30 days.

 It is apparent from the record, and counsel for Colling in oral argument in effect conceded, that the settlement negotiations were predicated upon Colling's ability to procure a loan to pay Reese so that Jesse would have title to 65 acres free of incumbrance. SDC 47.0234 provides: "Though the parties to an accord are bound to execute it, yet it does not extinguish the obligation until it is fully executed." Consequently, when Colling failed to pay Reese, the accord was not executed and Colling's obligation to Jesse has not been discharged. Lang v. Burns, 77 S.D. 626, 97 N.W.2d 863. The fact that Jesse did not prevail on his cross claim of damages for fraud and the court's dismissal of such cross claim does not preclude Jesse from recovering such indebtedness as may be owed him by Colling. See Witzig v. Philips, Minn., 144 N.W.2d 266. The court's allowance to Jesse of a right of redemption if Colling defaulted was not a part of their accord and cannot be considered as a satisfaction of such indebtedness and we believe it was not so intended by the court.

Some contention is made that the finding of no delivery of the escrow documents is inconsistent with the court's authorizing redemption by Jesse if Colling failed to do so, since Jesse could not redeem without having an interest in the subject property. We do not believe the court's finding of no delivery was intended as a determination that Jesse was without an equitable interest in such property and there is substantial evidence to sustain such determination without the necessity of an actual delivery of such documents.[19] But, such interest was always subject to the executory contract and could be divested by failure to comply with the terms thereof as provided in the judgment.

Other error claimed has been considered and is deemed to be without merit.

---

19. See note 17 supra.

Affirmed.

ROBERTS, HANSON and BIEGELMEIER, JJ., concur.

RENTTO, P. J., not participating.