KELLY, Appellant, v. GRAM, et al., Respondents

(38 N. W.2d 460.)

(File No. 8981.   Opinion filed July 19, 1949)

Rehearing denied Oct. 21, 1949.

**Stephens & Riter,** Pierre, **Earl F. Jackson,** St. Paul, Minn., for Plaintiff and Appellant.

**Martens & Goldsmith,** Pierre, for Defendants and Respondents.

RICE, Circuit Judge.  Plaintiff and appellant, Daniel S. W. Kelly, and Ilma Kelly Gram, the defendant and respondent, are brother and sister. They are the only children and heirs of Robert L. Kelly, who for many years was a photographer in Pierre. He died on May 30, 1934, at the age of 83, after some years of ill health. Subsequent to 1932 he lived with defendant at her home in Minneapolis. Defendant is fifteen years older than plaintiff. She served as an army nurse in the first World War, after which she went to Minneapolis for further training, marrying her co-defendant, Robert Gram, in 1926.  They established a home in Minneapolis and lived there until shortly before this action was commenced in 1945.  They had no children.  Plaintiff enlisted in the navy in 1917, at the age of sixteen, serving until 1919. Thereafter he attended the University of Wisconsin, graduating in 1925, since which he has resided almost continuously in Milwaukee.  While in college, in 1919, plaintiff married and to the marriage a daughter, Jean, was born.  He secured a divorce in 1924 and was awarded the custody of his daughter.  In 1926 he remarried and to this union a son, Bobby was born.  Plaintiff secured a divorce from his second wife and was given the custody of his son.  Defendant cared for

Jean Kelly in her home, as her own daughter, for several years subsequent to 1926. She cared for Bobby between 1935 and 1938. The trial court found that plaintiff had made settlement with her for taking care of his children. As to whether she was compensated for the love and affection bestowed, is not within the issues of this case.

Plaintiff in his complaint asked to be decreed the owner of a half-interest in the property which belonged to his father. This includes business properties in Pierre and Philip, personal property—principally photographer's equipment—and land in Stanley and Haakon counties. He also asked a judgment for $4,835.92, and that it be decreed a lien on the property. This was for money loaned his father and payment of mortgage indebtedness which will be described later. The defendants, by their answer, asserted ownership in all the property, and by a counterclaim asked a judgment against plaintiff for $7,375.00, based on claims for the care and support of plaintiff's children.

The judgment of the trial court found that defendants were the owners of all of the property in dispute, but gave judgment to plaintiff for the amount asked and denied defendants judgment on their counterclaim.

Defendant Ilma Gram's title to the property in dispute rests upon deeds executed by her father on June 5, 1929, in which she is the grantee, a bill of sale to the personal property, executed June 26, 1929, and a deed to the Nelson property, dated July 10, 1930. The deeds were recorded and the bill of sale filed in July 1934, following the father's death. In June 1944, by conveyances to a third party, the title was placed in defendant Ilma Gram and her husband, Robert Gram, in joint tenancy. As Robert Gram does not assert title as an innocent third party, the issues will be treated as existing between plaintiff and his sister, and she will be referred to as the defendant. She did not appeal from the adverse judgment on her counterclaim and that is now final.

Plaintiff by his assignments of error asks reversal of the judgment on three grounds: first, that there was no valid delivery of the deeds from Robert L. Kelly to defend-

ant; second, that the evidence requires a finding that defendant holds an undivided one-half of the property in trust for him; and, third, that defendant is in equity estopped from asserting he is the owner of such half-interest. In considering the claims of plaintiff, further history of the relations of the parties will be developed. As a preliminary thereto it may be stated that the father at all times had a strong affection for both his children and they for each other. There was no family trouble of any kind and no misunderstanding, at least until 1941, when defendant refused to convey a half-interest in the property to plaintiff. Plaintiff did not learn that the property had been placed in joint tenancy by defendant until 1945. This action was then commenced. No question is raised as to the father's mental capacity. He was a business man of intelligence and character, who retained his faculties until his death.

The deeds (except to the Nelson lot) were executed by Robert L. Kelly at Pierre in June 1929, before a Pierre banker, J. R. (Jim) McKnight, an old-time friend, as notary public. Neither child was present. In July, following, Robert L. Kelly made a trip to Minneapolis to visit his daughter, taking the deeds along and a will which he had drafted in his own handwriting in 1922. This will is witnessed and in customary form, and gives all of the father's property to the daughter, Ilma, except a legacy of $100 to plaintiff. There is evidence in the record, in a letter from Ilma, that this will was executed to place the father's property, in the event of his death, beyond the reach of plaintiff's first wife. This and the will itself are only material in so far at it is evidence of the intention of the father in disposing of his property, or attempting to do so, by deed.

Defendant's evidence of delivery is that at her home, in July 1929, her father showed her the deeds, the bill of sale and will, handed them to her and said, in effect, "I am giving you these deeds * * *. If there's a court action the court may not accept this, in case they don't I am giving you the will. If the Court will accept these deeds it will save probate expense but if anything comes up you will have this will." She testified that her father told her she

was to have the property, because Dan had received an education and more advantages than she, and because she would take care of Dan's children and had their interests at heart; that in case of need of the children, Bobby and Jean, she would have it for their care. Upon defendant's inquiry as to what she would do with the deeds, her father assented to her proposal that he take care of the deeds and the will and look after the property, because she was not a good business woman. The deeds were then placed in a suit case and were in the father's possession until his death. The testimony of Mrs. Mabel Sombke, an old and intimate friend of the family and particularly of Ilma, in all respects corroborates the testimony of defendant. Thereafter Robert Kelly returned to Pierre, taking the deeds and will with him. At Christmas time in 1929 he was again at his daughter's and plaintiff was likewise a guest. At that time the father asked the son to make a trip to Pierre, secure the deeds from his place of business, rent a safety deposit box and place them therein. The evidence is undisputed that he did this. It is likewise undisputed that after the claimed delivery the father retained complete control and possession of the property. He entered into a party wall agreement and paid part of the cost of the wall. He collected the rentals, paid the taxes and insurance, until his death. At least for some months before the father's death, the deeds were in a suit case in a closet off from the room occupied by him, and on various occasions were examined by him.

Possession of the deeds by grantor, permitting their destruction after claimed delivery, and retention of possession of the property, both constitute strong evidence of non-delivery. However, they do not invalidate a delivery previously made. In view of the trial court's express finding of delivery, supported not only by the testimony of defendant but of Mrs. Sombke, we conclude that the finding of the trial court should stand. Decisions of this court, supporting our views on delivery are: Wilmarth v. Hill, 55 S. D. 410, 226 N. W. 557; Birchard v. Simons, 59 S. D. 422, 240 N. W. 490; McGillivray v. Wipf, 64 S. D. 367, 266 N. W. 724; Benson v. Benson, 63 S. D. 241, 257 N. W. 460; Strain v. Ferris, 65

S. D. 226, 272 N. W. 677; Ansted v. Grieve, 57 S. D. 215, 231 N. W. 912.

Plaintiff's second contention is that there was an express agreement that defendant would hold title to one-half of the property as trustee for him. In support of this claim he testified to several conversations with his father, while defendant was present, to the effect that although the property would be conveyed to defendant, both children were to share equally therein. The first of such conversations was at Christmas time, 1928, and as testified to by plaintiff was as follows:

"He said 'Ilma you are fifteen years older than Dan, I am going to make these deeds over to you, I have got confidence in you, I know I can depend upon you to do what I want.' He said, 'After I pass on I want you to pay the funeral expenses and other expenses and after the property is all clear and unencumbered I want you Ilma to deed Dan a half interest in the property. He asked Ilma whether she would follow his wishes, whether she would do that and Ilma said 'Yes, dad I will, you can count on me dad.' Dad asked me if I was satisfied with the arrangements and I said 'yes, dad I trust Ilma as much as you do, I am perfectly satisfied.' "

Other conversations, to the same effect as testified to by plaintiff, took place at defendant's home in June 1930, at Christmas in 1932 and at Christmas in 1933. The latter talks are to the effect that the half-interest in the property was to be deeded to plaintiff after the Nelson mortgage was paid. This mortgage, in the amount of $4700, was placed on Lot 11, Mr. Kelly's original place of business, and on Lot 10, the Nelson lot adjoining, both 25-foot lots on Pierre Street, the business street of Pierre, for the purpose of raising the purchase price of the latter. At Christmas in 1929 and at the time the father asked his son to make the trip to Pierre, to get the deeds, which were to be placed in a safety deposit box, he also asked him to investigate the possibility of purchasing the Nelson lot. The father had long been desirous of obtaining this property and the owner having died, it appeared to him that it was the opportune time to buy. The plaintiff made the Pierre trip, in January

1930, and after considerable negotiation the property was purchased from the Nelson estate for $5250. Of this purchase price plaintiff advanced $100 and later $400, before the final settlement by raising the balance by the mortgage to Mr. Burke. This mortgage was a source of much worry to Mr. Kelly, because of the ensuing hard times and the possibility of losing both lots. This is disclosed by his letters and injunctions to his children to stand together and use all their efforts to pay the debt. To help his father, plaintiff paid $1,000 thereon in 1933. No evidence of debt or security was received by plaintiff. It may be noted that the mortgage on the father's lot was given by him after the execution and delivery of the deed to defendant. In July 1930, Mr. Kelly executed a deed to the Nelson lot wherein defendant is grantee. The evidence as to delivery is similar to that relating to the other deeds and it was placed therewith.

The conversations as to conveyance and any agreement to hold the property in trust were denied by defendant. The circumstances corroborating Dan's claim are that he knew of the execution of the deeds, that a close family relationship continued and that the father confided in the son the knowledge of his most private financial affairs, and that he asked his son's advice and assistance. Dan did help his father and extended financial assistance, as described, and also loaned his father $200 on December 20, 1933.

Numerous letters passing between the father and son were received in evidence. None of these refer to any agreement that defendant was to hold title in trust for plaintiff, but, on the other hand, none negative the claimed understanding. Corroboration of the trust, as testified to by plaintiff, may be found in numerous letters written by defendant to him. We will not refer to all of these, but will quote from some which are most significant.

The father died in Minneapolis and the funeral and cremation of the body took place there.

On July 6, 1934, defendant wrote plaintiff:

"Have been expecting to hear from you every day. You know we must get out there and look after things. I

have had a letter from Johnson in Philip and a letter from Jim saying he had been expecting us every day. We are losing money every day and things must be put in shape. When do you think you can get away. I don't think we ought to wait any longer. So let me hear from you right away."

Again, on July 9th, she wrote her brother that it was necessary that he accompany her to Pierre to file the deeds and bill of sale and attend to business matters there, without further delay. On July 24th the parties did go to Pierre together, defendant taking the deeds. They remained about ten days recording the deeds and jointly looking after business pertaining to the property. They employed J. R. McKnight, President of the Pierre National Bank, to look after the property for them. He did this from that time until the trial. An account in the names of both parties was opened in the bank for the handling of funds. An existing balance in the father's account, of $252.62, was transferred to the joint account. For a time the original bank statements were mailed to Dan, but, beginning January 1, 1935, the originals were mailed to defendant and copies to Dan. Dan took the suit case with the original deeds back with him to Milwaukee. On August 26, 1934, defendant wrote her brother as follows:

"If you will send up those deeds right away I will get them signed and notarized, and a contract drawn up which I will send to you for approval. I think that should be taken care of right away, for if anything happened to me things would be in an awful mess. The whole thing would be in the courts and tied up. Probably nothing left when the lawyers got through. So if you will send them up right away I will take care of it."

On September 12, 1934, she wrote:

"I also wish you would send up those deeds else I will have to make a will for things are in an awful mess as they are and one never knows how long they are going to live. Now I want that taken care of so please send them up right away."

Numerous letters follow, in which defendant informs plaintiff as to business pertaining to the property and asks

his advice as to how it is to be handled. In these she states that none of the income is being used by her and that expenditures are "estate business". She consistently used the plural "we" or "ours" in referring to the property or its income. In a letter written July 30, 1935, she says, "It is our property and I think we ought to keep it that way don't you?" On March 11, 1936, she wrote:

"In another four days you will owe me $120.00 for the children. You know of course my circumstances and that I have no money. I have had to draw on Pierre. * * * What money I draw on Pierre for the children I draw a like amount for myself as I feel I have a right to half the income."

About January 1, 1937, plaintiff, at defendant's request, paid $3500, the balance of the mortgage. No evidence of debt was taken therefor, but various payments to plaintiff thereon were later made from the joint account. On March 12th defendant wrote:

"Am enclosing March Bank Statement. I thought perhaps I hadn't better send you a check until the taxes are paid and there is plenty there to pay them so will be able to continue your payments next month."

Mr. McKnight, in writing to the parties as to the properties, refers to it as being jointly owned. In the summer of 1937 Dan and Ilma took a vacation trip together to the Yellowstone and in doing so stopped at both Pierre and Philip. While there they inspected the property and attended jointly to business. The relationship between the parties continued, as indicated from the foregoing, until early in 1941, when an effort at settlement was made. At defendant's request plaintiff had an agreement drawn, which provided that the property should not be sold or mortgaged until the indebtedness to plaintiff was paid, at which time a half interest was to be conveyed to him. In declining to sign this plaintiff received a letter from defendant, dated March 17, 1941, stating:

"I have given this matter very careful thought and from every angle, I discussed it with an attorney and got his views from every side. Then I took into consideration

that it was after all Dad's money and he gave very specific instruction as to what was to be done with it. * * * I have decided to let things rest as they are for the present.

"I believe that we should work up a balance in Pierre. The fire hazard is very great and you know what would be the result if the buildings should burn, so let's keep the major portion of the income in what we might call a fire fund. What we take out will be divided between us.

"This may not meet with your approval on first thought —but I am sure that after you have given it careful consideration you will realize that it is best not to divide the property. * * *

"Too many complications can arise with a divided estate as small as this one.

"Needless to say I will make no moves without consulting you but you will have to trust me as you have in the past. * * *

"You are my brother Dan, the only near relative I have. I have never failed you yet and I have no intention of doing so now."

The last letter of any significance was written by defendant on April 25, 1943, in which she says, "I am not using Pierre money for myself believe it or not."

Defendant's explanation of her letters and conduct is that she planned on giving Dan a half interest in the property, because of her affection for him, but changed her mind because of his conduct. She is specific that there was no agreement with her father to do so. That the income was handled as it was to apply on the indebtedness admittedly due her brother.

As pointed out in Jaeger v. Sechser, 65 S. D. 38, 270 N. W. 531, and again in Seubert v. Seubert, 68 S. D. 195, 299 N. W. 873, there are two principles upon which the court acts in establishing a constructive trust: First, that it will not permit the statute of frauds to be used as an instrument of fraud; and, second, that where one uses a confidential relationship to obtain an advantage which he cannot conscientiously retain, the court, to prevent the abuse of confidence, will grant relief. The first ground is based on

estoppel, and any consideration necessary will be discussed thereunder. At this time we will consider the second ground. A confidential relationship is admitted and if the trial court found that defendant promised her father that she would convey to her brother, a constructive trust would necessarily have been decreed. However, the trial court chose to believe that defendant did not make such a promise and we cannot say that such finding is against the clear preponderance of the evidence. To establish a constructive trust, the evidence must be clear and convincing. Jones v. Jones, 67 S. D. 200, 291 N. W. 579. The trial court may have well believed that plaintiff's evidence in this case did not supply this quantum of proof, and we cannot say that it erred in so doing.

The third contention urged for a reversal of the trial court's judgment is based on estoppel. The evidence is undisputed that between the occasion when the parties made the Pierre trip together, in July 1934, until 1941 and perhaps 1943, defendant treated plaintiff as the owner of an undivided one-half of the property. During this long period she did virtually no business relating thereto, without obtaining her brother's approval. She informed him as to all business and repeatedly wrote that he was entitled to one-half of the income and handled all income as trust funds, of which plaintiff was to receive one-half. Defendant's belief in and promise of equal division was expressed as far back as 1922, after the father had made the will leaving all of his estate but $100 to her. In a letter dated November 7, 1922, to plaintiff, she wrote:

"* * * and you know that half that money is yours and that you will get it. The only reason papa fixed it that way was to keep Mildred (Dan's first wife) from getting same— the law you know would allow her at least a third and you don't want her to have it any more than we do. What money there is will be divided equally between you and me."

In 1934 she wrote two letters (Exhibits 3 and 4) offering to deed to plaintiff a half-interest in the property. In the letter written March 17, 1941, the inference of an interest

in the property in plaintiff is irresistible. What is defendant's explanation of her conduct? She testified that while in Pierre, at the St. Charles Hotel, Dan brought her deeds to sign and she told him she would execute them if he would enter into a contract that neither could sell or mortgage the property without the consent of the other. That this was in fact the agreement and understanding of the parties is shown by the written contract prepared seven years later at defendant's request, containing such terms, but which she refused to sign in her letter of March 17, 1941, quoted above. Her explanation of such refusal is,

"* * * My father had told me implicitly to keep the property in my own hands but I thought I might give it to him of my own volition, that was against my father's wishes and when I told an attorney so he advised me strongly against doing it."

Her explanation of the promises in 1934 is that she asked Dan to have the deeds drawn, so that he would return the suit case with the deeds. She testified, "I knew he was very anxious to have me sign those deeds and if I said I would do it he would send up the suitcase and that way I would get hold of the deeds." She did not, however, ask Dan directly to return the old deeds and they were returned a few months later.

In further explanation defendant testified she had been willing to have Dan paid back the money he had put into the property, but "because he did not treat his children right" had decided he was to have no interest therein.

These explanations impliedly admit the promises by defendant, but, without them, a fair preponderance of the evidence clearly requires a finding of the representation by her of plaintiff's ownership of a half-interest in the property. Did he believe and rely thereon to his prejudice? His advances on the purchase of the Nelson lot, his services in its purchase, his trip to Pierre to secure the deeds, at Christmas in 1932, may be ascribed to filial affection. However, it is also corroborative of defendant's intention and plaintiff's belief, after the father's death. The trip to Pierre, when the deeds were recorded, the Yellowstone trip, the letters, tele-

grams and telephone calls, the advancement of $200 and the payment of the mortgage in 1936 are more logically explained by plaintiff's belief in his ownership in a half-interest in the property, than by affection for his sister.

In Somers v. Somers, 27 S. D. 500, 131 N. W. 1091, 1093, 36 L. R. A., N. S., 1024, this court said,

"To create an estoppel, there must have been some act or conduct upon the part of the party to be estopped, which has in some manner misled the party in whose favor the estoppel is sought and has caused such party to part **with something of value** or do some other act relying upon the conduct of the party to be estopped, * * * ."

"A person who knows the facts, and who, without objection, permits another to make improvements or **expenditures** on, or in connection with, his property, or in derogation of his rights under a claim of title or right, will be estopped to deny such title or right to the prejudice of the other." 31 C. J. S., Estoppel, § 94, page 314.

The fact that plaintiff paid the $3500 mortgage indebtedness, without taking a note, mortgage or contract insuring repayment of his money, appeals to us as being sufficiently to his prejudice to satisfy the accepted rule. Under these circumstances a court action might have been necessary to establish his rights. Defendant would appear in a more favorable light in urging to the contrary, if she had, immediately before or during the litigation, offered plaintiff the return of his money.

Defendant's counsel state, "She treated the property as incumbered with a moral obligation on her part to preserve it for the purpose for which her father intended it to-wit: for herself and to provide for the two grandchildren in case of necessity." This may have been the situation at the time of the father's death, but eight years later defendant's promises and conduct, acted and relied upon by plaintiff, fully justify the application of the doctrine of estoppel.

There is another phase of estoppel which merits consideration, in order that it may be known that it has been considered. It is that the representation must ordinarily be of a present or past fact or state of things. 19 Am. Jur.,

Estoppel, § 52, p. 656. As to whether defendant's statements related to the ownership of a half-interest in the father's estate at the time they were being made, or were promissory as to her intention to give Dan a half-interest, might be debatable. However, regardless of the interpretation thereof, we conclude there has been an estoppel. The doctrine of promissory estoppel is well recognized. See Fried v. Fisher, 328 Pa. 497, 196 A. 39, 41, 115 A. L. R. 147, with note. Therein is quoted Section 90 of the Restatement of Contracts, as follows:

"A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by the enforcement of the promise."

As applied to an executory contract, the enforcement of which was prohibited by the statute of frauds, this basis for estoppel was approved in Federal Land Bank of Omaha v. Matson, 68 S. D. 538, 539, 5 N. W.2d 314. It is also applied where the owner of an interest in real property disclaims his title thereto and in reliance thereon a party assumes or retains possession and makes valuable improvements and expenditures. See Dickerson v. Colgrove, 100 U. S. 578, 25 L. Ed. 618, referred to as a leading case in Thom v. Thom, 208 Minn. 461, 294 N. W. 461; and Vogel v. Shaw, 42 Wyo. 333, 294 P. 687, 75 A. L. R. 639, a Wyoming case cited in Federal Land Bank v. Matson, supra. See, also, Federal Land Bank v. Houck, 68 S. D. 449, 4 N. W.2d 213, 219, wherein 31 C. J. S., Estoppel, § 109, p. 349, is quoted as follows:

"In order to create an estoppel by the acceptance of benefits, it is essential that the party against whom the estoppel is claimed should have acted with knowledge of the facts and of his rights, * * *."

Defendant was fully cognizant of her rights.

We conclude that the payment of the mortgage debt and the time and expense incurred in assisting defendant in the management of the property for eight years was sufficient detriment to justify us in concluding that defend-

ant is estopped from denying that she holds title to one-half of the property in trust for plaintiff.

Defendant has urged that estoppel is not available to plaintiff because it was not pleaded. The rule is that when a party has an opportunity to plead an estoppel he must do so. Smith v. Cleaver, 25 S. D. 351, 126 N. W. 589; Sutton v. Consolidated Apex Mining Co., 14 S. D. 33, 84 N. W. 211. As a defense it must be pleaded. State ex rel. Hurd v. Blomstrom, 72 S. D. 526, 37 N. W.2d 247. Most of the evidence referred to herein as the basis for estoppel was pleaded in the complaint and all of it was received without objection. Defendant was in no way misled and we do not believe is in a position to urge the objection as to failure to plead at this time.

The following is from 31 C. J. S., Estoppel, § 153, page 445:

"An estoppel which is part of the title may be given in evidence although not pleaded; and the failure to plead estoppel is waived by proceeding with the trial of the case without objection."

The judgment of the trial court is reversed.

SMITH, P.J., and SICKEL and HAYES, JJ., concur.

RUDOLPH, J., dissents.

RICE, Circuit Judge, sitting for ROBERTS, J., disqualified.