FARMERS ELEV. CO. OF ELK POINT, Respondent v.
LYLE, Appellant

(238 N.W.2d 290)

(File No. 11523. Opinion filed January 27, 1976)

Sam W. Masten, Canton, for defendant and appellant.

Charles A. Wolsky, Vermillion, for plaintiff and respondent.

WOLLMAN, Justice.

Defendant appeals from a judgment in the amount of $11,480 awarded against him in favor of plaintiff following a trial to the court on the issue of defendant's liability on an oral contract to deliver corn to plaintiff. We affirm.

On April 16, 1973, defendant came to plaintiff's office in Elk Point, South Dakota, and spoke with William Bowar, plaintiff's manager, about the market price of corn. After some discussion about the prospects of the market, defendant asked Bowar what he could bid for corn, to which Bowar replied that he could bid $1.22 per bushel. Defendant indicated that he had some 20,000 bushels of corn to sell and asked whether Bowar " * * * couldn't do a little better on a large amount of corn like that * * *," to which Bowar replied that $1.22 was the most that he could bid. Defendant then told Bowar that he would sell him 20,000 bushels and that one Willis Morse, a local trucker, would haul the corn. Bowar replied that he did not believe that Morse would be in-

terested in hauling any grain while the load limits were still in effect, so that it would have to be a May delivery. Defendant responded that May delivery was satisfactory with him and indicated that Bowar was to notify Morse when the corn was to be delivered. Contemporaneously with this discussion, Bowar made an entry in his ledger indicating that he had purchased 20,000 bushels of corn from defendant for $1.22 per bushel for May delivery.

The substance of the above described conversation between Bowar and defendant was confirmed by the testimony of a farmer from the Elk Point area who had overheard the conversation.

Mr. Morse testified that defendant had stopped at his farm on the afternoon of a day approximately in the middle of April 1973 and had asked whether Morse would haul some corn for him. In response to Morse's inquiry, defendant said that he had sold the corn at plaintiff's elevator in Elk Point.

On April 17, 1973, Bowar sold ten loads of corn, or approximately 8500 bushels, to a Mr. Norton, and on April 18 or 19, 1973, sold 20 loads of corn to H & I Grain Company. Although Bowar was not permitted to fully explain his method of operation in buying and selling corn, we think that the clear import of his testimony is that following his purchase of corn from defendant on April 16, 1973, he sold 30 loads of corn, including the 20,000 bushels he thought he had purchased from defendant, to the two purchasers named above. The 30 truck loads were picked up by the purchasers during the period of April 17-18, 1973, and were made up from an early delivery of corn by another farmer in the amount of 18,000 to 25,000 bushels, which Bowar was using as a revolving inventory. As Bowar testified, " * * * We don't buy one man's corn and keep this one man's corn and identity preserved, we buy bushels and we sell bushels." Further, he testified that it was not often that he waited for corn to come into the elevator before he in turn sold it.

On May 7, 1973, Bowar sent Morse out to defendant's farm to pick up the corn. When Morse got out to the farm, defendant told him that he could not haul the corn that day. Defendant came to

plaintiff's office later that afternoon and told Bowar, "I can't deliver that corn to you, I got a $1.45 in Beresford * * *." In response to Bowar's statement that he had sold defendant's corn and had to make delivery, defendant replied, "Yes, I know, they all tell me this, that they sell just the way they are buying but I have always questioned it or have reservations whether this is really fact." Bowar told defendant to think it over some more and get back in touch with him. Bowar testified that following this conversation he was " * * * still sure he (defendant) would deliver."

After hearing nothing further from defendant, Bowar called him on June 4, 1973, and told him that plaintiff's board of directors had decided that if defendant didn't bring the grain in, the board would take action. Defendant replied that that was plaintiff's prerogative. Bowar called defendant three days later and told him that he would wait several more days before contacting legal counsel in the event defendant had not delivered the corn within that time. Defendant made no delivery.

Bowar testified that to cover the sales that he had made on the strength of the purchase of defendant's corn, he purchased 10,000 bushels of corn on June 13, 1973, at a cost of $1.88 per bushel and 10,000 bushels (out of a total purchase of 18,000 bushels that day) on June 26, 1973, at $1.83 per bushel.

Defendant's version of the alleged transaction was that he had asked Bowar the price of corn and that in response to Bowar's questions he replied that he had between 18,000 and 20,000 bushels to sell and that maybe he would sell it. Defendant denied stopping at Morse's farm to arrange for hauling the corn and testified that he told Bowar on May 7, 1973, that he was not going to deliver the corn.

The trial court found that defendant had agreed to sell 18,000 to 20,000 bushels of corn to plaintiff at $1.22 per bushel; that defendant in fact had 18,000 bushels of corn to sell; that the 18,000 bushels purchased by plaintiff from defendant on April 16, 1973, was included in the 30 loads of corn sold by plaintiff between April 17 and 19, 1973; that after the conversation with

defendant on May 7, 1973, Bowar was still sure that defendant would deliver the corn; and that it was on June 4, 1973, that defendant denied the contract to deliver the corn. The court concluded that plaintiff had substantially changed its position in reliance on the oral contract by selling 18,000 bushels of corn to the two third parties in accordance with plaintiff's general business practice; that defendant knew or should have known that plaintiff would rely on the contract and would resell defendant's corn; that defendant was estopped from invoking the statute of frauds as a defense to plaintiff's claim; and that plaintiff's purchases of corn on June 13 and June 26, 1973, to cover defendant's corn were made within a commercially reasonable time after defendant's breach.

■ We conclude that the trial court's finding that defendant had agreed to sell 18,000 bushels of corn to plaintiff for $1.22 per bushel is not clearly erroneous. In fact, the proof in support of this finding might very well be said to meet the clear and convincing evidence test. Brown v. Warner, 78 S.D. 647, 107 N.W.2d 1; Cromwell v. Hosbrook, 81 S.D. 324, 134 N.W.2d 777.

Defendant contends that the oral contract, if in fact one was entered into, is not enforceable by virtue of SDCL 57-3-1, which provides in part that:

"Except as otherwise provided in §§ 57-3-2 and 57-3-3 a contract for the sale of goods for the price of five hundred dollars or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. * * * "

Defendant argues that we should not permit inroads to be made upon the protection afforded under this provision of the Uniform Commercial Code. However, we note that SDCL 57-1-25 provides that:

"Unless displaced by the particular provisions of

this title, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions."

■ We are not persuaded that there is any good reason why the doctrine of equitable estoppel should not be applied in a proper case to prevent a party from asserting the statute of frauds embodied within SDCL 57-3-1. Oxley v. Ralston Purina Co., 6 Cir., 349 F.2d 328; 3 Williston on Contracts (3rd Ed. Jaeger) § 533A; J. White & R. Summers, Handbook of the Law under the Uniform Commercial Code § 2-6; Dangerfield v. Markel, N.D., 222 N.W.2d 373; Nelson v. Glasoe, N.D., 231 N.W.2d 766.

This court has long recognized that a party may be estopped by his acts or conduct to claim what would otherwise be his legal rights. For example, in the case of Somers v. Somers, 27 S.D. 500, 131 N.W. 1091, this court stated that:

> "To create an estoppel, there must have been some act or conduct upon the part of the party to be estopped, which has in some manner misled the party in whose favor the estoppel is sought and has caused such party to part with something of value or do some other act relying upon the conduct of the party to be estopped, thus creating a condition that would make it inequitable to allow the guilty party to claim what would otherwise be his legal rights. * * * " 27 S.D. at 504, 131 N.W. at 1093.

See also Farmers' Shipping Ass'n v. Nordgren, 56 S.D. 152, 227 N.W. 576; Iowa Guarantee Mortgage Corp. v. General Motors Acceptance Corp., 62 S.D. 18, 250 N.W. 669; Lehman v. Smith, 40 S.D. 556, 168 N.W. 857; Hood v. Sioux Steel Co., 67 S.D. 1, 287 N.W. 636; Babcock v. McKee, 70 S.D. 442, 18 N.W.2d 750; Weaver v. Bauer, 76 S.D. 401, 79 N.W.2d 361.

In Federal Land Bank of Omaha v. Matson, 68 S.D. 538, 5

N.W.2d 314, it was stated that:

> "This court is committed to the view that the doctrine of equitable estoppel may prevent a party to an oral agreement from invoking the Statute of Frauds. (citations omitted) The elements of proof which invoke an estoppel in such case are three, namely, (a) the oral agreement must be established by satisfactory evidence; (b) the party asserting rights under the agreement must have relied thereon and have indicated such reliance by the performance of acts unequivocally referable to the agreement; and (c) it must appear that because of his change of position in reliance on the agreement, to enforce the statute will subject such party to unconscionable hardship and loss." (citations omitted) 68 S.D. at 541, 5 N.W.2d at 315.

The trial court's memorandum decision referred to the doctrine of promissory estoppel as set forth in Restatement, Contracts, § 90, as a basis for holding that defendant was estopped from raising the statute of frauds as a defense. This doctrine was first recognized and given effect by this court in Northwestern Engineering Co. v. Ellerman, 69 S.D. 397, 10 N.W.2d 879. Although technically this doctrine applies only to those situations in which an enforceable promise would otherwise not exist, see, e.g., Del Hayes & Sons, Inc. v. Mitchell, Minn., 230 N.W.2d 588; Sacred Heart Farmers Coop. Elevator v. Johnson, Minn., 232 N.W.2d 921;* Annot., 56 A.L.R.3d 1037; Henderson, "Promissory Estoppel and Traditional Contract Doctrine," 78 Yale L.J. 343, the distinction between promissory estoppel and equitable estoppel has not been consistently maintained and the doctrine of promissory estoppel has been applied to prevent a party from asserting the defense of the statute of frauds. As stated by one commentator,

> "With minor exceptions, the recent cases pitting promissory estoppel against the defense of the Statute

---

* The Minnesota Supreme Court also held in these two cases that the facts therein did not warrant the application of the doctrine of equitable estoppel to overcome the defense of the statute of frauds.

of Frauds involve bargains, not gratuitous promises. They arise from attempts to create original contract obligations rather than from revisions of existing relationships. Above all, there is seldom any indication that the court is not convinced that the oral contract was in fact made. Given these factors, it is not surprising that the elements of promissory estoppel tend to be applied in the language of the tests of bargain consideration. There is also some tendency in the Statute of Frauds cases to lump promissory with equitable estoppel, with some courts apparently taking the position that only equitable estoppel will preclude the raising of the Statute. Because doctrines based on estoppel or fraud are so often applicable to cases falling within Section 90, it is not unusual to find a court employing multiple theories simultaneously in a single case." Henderson, supra, 78 Yale L.J. 343, 381 (footnotes omitted)

One noted commentator has stated that:

"The most recent, and quite possibly the most important, development in the promissory estoppel or § 90 cases has been the suggestion that such contract-based defenses as the Statute of Frauds are not applicable when the estoppel (or reliance) doctrine is invoked as the ground for decision. * * * " G. Gilmore, The Death of Contract 90 (1974).

See also 56 A.L.R.3d 1037, § 6.

Indeed in Kelly v. Gram, 73 S.D. 11, 38 N.W.2d 460, this court stated that the basis for estoppel approved in Federal Land Bank of Omaha v. Matson, supra, was the doctrine of promissory estoppel. Cf., Skillman v. Lynch, 74 S.D. 212, 50 N.W.2d 641; Shaw v. George, 82 S.D. 62, 141 N.W.2d 405; Williams v. Denham, 83 S.D. 518, 162 N.W.2d 285.

We believe that the facts in the instant case warrant the application of the doctrine of equitable estoppel as set forth in Federal Land Bank of Omaha v. Matson, supra, and our other

decisions cited above. See also Monarco v. Lo Greco, 35 Cal.2d 621, 220 P.2d 737. That being the case, there is no particular need for us to decide whether the doctrine of promissory estoppel constitutes a new and independent ground upon which defendant is barred from raising the defense of the statute of frauds. Cf., McIntosh v. Murphy, 52 Haw. 29, 469 P.2d 177.

■We turn, then, to the question of damages. Notwithstanding defendant's claim that he unequivocally informed Bowar on May 7, 1973, that he was not going to deliver the corn, the trial court found that Bowar was of the opinion following this conversation that defendant still would deliver the corn. The trial court found that it was on June 4, 1973, that defendant denied the alleged contract. Neither finding is clearly erroneous.

When plaintiff became aware on June 4, 1973, that defendant would not deliver the corn in compliance with the contract, plaintiff elected to avail itself of the remedy provided by SDCL 57-8-28 and 57-8-31.

SDCL 57-8-28 provides in part that:

"Where the seller fails to make delivery or repudiates * * * the buyer may * * *

(1) " 'Cover' and have damages under §§ 57-8-31 to 57-8-33, inclusive, as to all the goods affected whether or not they have been identified to the contract * * *."

SDCL 57-8-31 provides that:

"After a breach within §§ 57-8-28 to 57-8-30, inclusive, the buyer may 'cover' by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller."

SDCL 57-8-32 provides that:

"The buyer may recover from the seller as damages

the difference between the cost of cover and the contract price together with any incidental or consequential damages as hereinafter defined (§§ 57-8-39 and 57-8-40), but less expenses saved in consequence of the seller's breach."

The trial court found that the purchases made by Bowar on June 13 and June 26, 1973, were made within a commercially reasonable time after defendant's breach of contract. SDCL 57-1-14 provides in part that, " * * * What is a reasonable time for taking any action depends on the nature, purpose and circumstances of such action. * * * " The comment to Section 2-712 (SDCL 57-8-31) states in part that:

"The test of proper cover is whether at the time and place the buyer acted in good faith and in a reasonable manner, and it is immaterial that hindsight may later prove that the method of cover used was not the cheapest or most effective.

"The requirement that the buyer must cover 'without unreasonable delay' is not intended to limit the time necessary for him to look around and decide as to how he may best effect cover. The test here is similar to that generally used in this Article as to reasonable time and seasonable action." Uniform Commercial Code, § 2-712, Comment 2.

As has been well stated, "The drafters (of the Uniform Commercial Code) have hardly left us with a solid basis upon which to predict whether a given act was or was not 'reasonable' * * *." J. White & R. Summers, Handbook, supra, § 6-3 at 178.

█ It has been held that a grain merchant should cover on the date that he becomes aware of the seller's repudiation where cover is easily and immediately available in the well organized and easily accessible market for purchases of grain to be delivered in the future. Oloffson v. Coomer, 11 Ill.App.3d 918, 296 N.E.2d 871. Because the record in the instant case does not disclose that cover was immediately available, however, we agree

with the trial court that plaintiff acted reasonably in making the first installment of the cover purchase on June 13, 1973. The remaining purchase on June 26, 1973, poses a problem, however, in view of the lack of evidence in the record why the cover could not have been fully effected on the earlier date. However, in view of the fact that the June 26 purchase was at a cost of 5 cents per bushel less than the June 13 purchase, we cannot see how defendant was prejudiced by the additional delay. Moreover, we believe that plaintiff acted in good faith towards defendant throughout the entire period from April 16, 1973, until the cover was finally made, see SDCL 57-1-13, and thus we are not inclined to disturb the trial court's finding that plaintiff acted in a commercially reasonable manner in making the two purchases to cover the corn that it had sold on the strength of its contract with defendant.

The judgment is affirmed.

All the Justices concur.