**In the Matter of the ESTATE OF Joe J. WILLIAMS, Deceased.**

**No. 14270.**

Supreme Court of South Dakota.

Argued Jan. 17, 1984.

Decided May 9, 1984.

Douglas R. Bleeker of Shandorf, Bleeker, Boldt & Koch, Mitchell, for John R. Williams, Rosemary Williams Sayers, and Linda Williams Westover, appellants; Edward M. Bubak, Tyndall, on brief.

Lawrence E. Long, Martin, for Ward J. Williams, appellee; Fredric R. Cozad, Martin, on brief.

HENDERSON, Justice.

### ACTION

This is a civil appeal from an order entered by the Circuit Court for the Sixth Judicial Circuit on May 13, 1983, retaining the executor of the Joe J. Williams estate and estopping his heirs from asserting a lapse provision in his will. We affirm.

### FACTS

Joe J. Williams died testate on December 12, 1981, at Hot Springs, South Dakota. His wife, Stella, predeceased him in 1978. His will was admitted to probate on February 2, 1982, and his son, Ward J. Williams (Ward), was appointed executor.

The provision of the will of Joe J. Williams pertinent to this action is as follows:

SECOND, as concerns any farm and ranch real estate that I own at the time of my death ...

... I give, devise, and bequeath such unto my son, Ward J. Williams, upon the following express conditions:

That he make settlement with my other three children an [sic] pay unto them the amount and at the times and in the manner hereinafter set forth. I direct that the number of acres of land that he is receiving hereunder be multiplied by the sum of Seventy Dollars ($70.00) per

acre, and that the total amount thus arrived at be divided by four, and that such one-fourth share be the amount that he is to be required to pay to each of the other three children, such amount to be paid as follows:

Five per cent (5%) of the principal together with five per cent (5%) interest on the unpaid balance to be paid each year for a period of four years, with the full balance being paid on the fifth year. An example of what is intended hereunder being—if I had 480 acres of land at the time of my death, this times $70.00 per acre would amount to $33,600.00, divided by four would make each child's share amount to $8,400.00. The annual payment due each child for the four year period would be $420.00, with the interest the first year being $420.00, with the full balance of the principal in the amount of $6,720.00 being due in the fifth year. The payments to be made on the anniversary date of either mine or my wife's death, whichever occurs last.

As I have indicated herein, such amount to be paid each of my three children, Rosemary Sayers, John R. Williams, and Linda M. Westover.

The gift, devise, and bequest of such real estate to my son, Ward J. Williams, is made on the condition that he shall settle with the other three children as herein provided. In the event he for any reason does not make the payments to the other three children, as herein provided, I direct that the provision for him to receive said land shall lapse and become inoperative, and such land shall thereupon [pass] to my four children, that is, Rosemary Sayers, John R. Williams, Linda M. Westover, and Ward J. Williams, in equal shares, share and share alike. Ward and his boys have been staying on the place and helping us operate it, and we want him to have the opportunity of having the land, but want to be totally fair with our other children too, and this is why it is that we are making this provision.

Ward contends that as a result of a conversation with his brother John Williams, there arose a "family agreement" whereby he would pay the other heirs of the estate in lump sum, ignoring the payment provisions of the will. As his son, Steve, inclined toward ranching, Ward made arrangements for Steve to procure FHA financing, the funds to be used to settle the estate. Ward would then deed the property to Steve, giving him a start in the business. FHA approval took some time, but was finally accomplished in September 1982. Funding the loan was all that remained. Ward claims he informed his relatives of these developments in November 1982. The money became available in January 1983.

In December 1982, John and his sisters, Rosemary Sayers and Linda Westover (appellants), evidently became concerned at Ward's failure to comply with the will provisions. They deny the existence of any family arrangement and further contend they were unaware, not only of his proposed payment plans, but whether he, in fact, was considering purchasing the property at all. As the payment deadline passed, they claim the property devolved to all four heirs as tenants in common.

Appellants also raised concern over Ward's handling of the estate as executor. They contend Ward conducted the estate business in a self-serving manner. They urged he was negligent, if not willful, in failing to comply with the statutory requirements for administration. In addition, there were questions over Ward's decisions 1) to postpone sale of estate cattle for one year; 2) to place estate funds in a checking account; 3) to use proceeds from the cattle sale to pay off the Federal Land Bank and PCA mortgages, both debts of the estate; and 4) to sell a piece of machinery on time, with no interest. These decisions were without court approval.

On January 10, 1983, a petition was filed by appellants in the circuit court asking for distribution of the real estate to all four heirs. Further, appellants requested in the alternative that either Ward be required to perform his duties as executor or be removed from office. A hearing was held on April 5, 1983. Evidence was presented and

the court entered findings of fact and conclusions of law to the effect that: 1) Ward J. Williams had not engaged in a course of conduct meriting his removal; 2) Ward J. Williams must file a detailed inventory within fifteen days of all miscellaneous items; 3) the court would determine by evidence if there was detriment caused by keeping money in a checking account rather than a savings account and would take this into consideration on the executor's fee; 4) the other heirs were equitably estopped from enforcing the one-year lapse provision in the will because they desired a lump-sum payment, the heirs agreed to it, and Ward undertook efforts to secure financing to accomplish these purposes; 5) appellants were to each receive their willed share in a lump-sum payment; and 6) Ward was to receive the devised real estate only after appellants are paid their full distributive share.

## ISSUES

### I.

WAS THE TRIAL COURT'S FINDING CLEARLY ERRONEOUS IN REFUSING TO REMOVE WARD J. WILLIAMS FROM HIS POSITION AS EXECUTOR OF THE JOE J. WILLIAMS ESTATE? WE HOLD THAT IT WAS NOT.

### II.

WAS THE TRIAL COURT'S FINDING PROPER THAT THE BROTHER AND SISTERS OF WARD J. WILLIAMS ARE EQUITABLY ESTOPPED FROM ASSERTING A ONE–YEAR LAPSE PROVISION IN THE JOE J. WILLIAMS WILL DUE TO WARD WILLIAMS' FAILURE TO MAKE PAYMENTS WITHIN ONE YEAR FROM DATE OF DEATH? WE HOLD THE TRIAL COURT'S APPLICATION OF EQUITABLE ESTOPPEL WAS FAIRLY APPLIED.

## DECISION

### I.

"Our standard of review ... is to uphold the trial court unless its findings are 'clearly erroneous' ... [i.e.] 'when after reviewing all of the evidence we are left with a definite and firm conviction that a mistake was made.'" *Vaughn v. Eggleston*, 334 N.W.2d 870, 872 (S.D.1983). In applying this standard, our function is not to decide factual issues de novo. *In re Estate of Hobelsberger*, 85 S.D. 282, 181 N.W.2d 455 (1970). "[W]e must give due regard to the opportunity that the trial court has to judge the credibility of the witnesses and to weigh their testimony ... [and] accept the evidence including any reasonable inferences which are favorable to the trial court's determination." *Isaak v. Isaak*, 278 N.W.2d 445, 446 (S.D.1979). "It is well settled that the credibility of witnesses and weight of evidence is for the trial court ...." *Nicolaus v. Deming*, 81 S.D. 626, 627, 139 N.W.2d 875, 875 (1966).

■ There is no dispute that Ward did not file an inventory, as required by SDCL 30–16–1, and he did not file an inheritance tax report immediately, as outlined in SDCL 10–41–17. There was no court authorization for paying the Federal Land Bank or PCA mortgages on the estate (SDCL 29–6–19), nor for the sale of any estate property (SDCL 30–22–7). However, in none of these circumstances do the statutes mandate automatic removal of an executor upon a failure to comply. "The removal of a fiduciary is a drastic action which should be taken only when the estate is endangered and intervention is necessary to protect the property of the estate." *In re Estate of Pitone*, 489 Pa. 60, 68, 413 A.2d 1012, 1016 (1980). Irregularities in management which are not harmful to the estate will be overlooked, and "[i]f the court can readily remedy a matter of complaint, no removal will be ordered." *In re Hartt's Estate*, 75 Wyo. 305, 356, 295 P.2d 985, 1003 (1956). A failure or delay will not warrant removal unless such has caused a loss to the estate. *See In re Buchman's Estate*, 123 Cal.App.2d 546, 267 P.2d 73 (1954).

The delay in filing an inventory was based on Ward's decision that it would be

to the estate's tax advantage not to do so immediately. This decision was with the advice of counsel. There was testimony that an inventory was finally filed in January 1983, and a stipulation was received from the Department of Revenue stating no tax liability. Rarely is such loss considered a detriment.

■ Appellants claim that Ward has acted in a cavalier manner in conducting the affairs of this estate as if it were his own property and business. As further ground for removal, they claim that Ward gambled with the assets of the estate in continuing an unauthorized cow/calf ranching business, again, based solely on personal judgment. SDCL 55-5-1, however, provides that "a fiduciary shall exercise the judgment and care under the circumstances then prevailing, which men of prudence, discretion and intelligence exercise in the management of their own affairs ...." The "law holds no executor responsible for the consequences of his mistakes which are the result of the imperfection of human judgment and do not proceed from fraud, gross carelessness, or indifference to duty." *In re Buchman's Estate*, 123 Cal. App.2d at 556, 267 P.2d at 81-2. Although he had no court authorization, Ward assumed the first consideration as administrator was to maximize assets in order to pay estate debts. He therefore decided to postpone the sale of his father's cattle until after calving. He then sold the calves, acquiring enough from this sale to pay off two estate mortgages. He still retained the cattle, whose eventual sale would fund the estate.

It is difficult to conceive what great harm has devolved on the estate because of Ward's administration; none has been clearly indicated. The trial court entered no finding of a violation of SDCL 30-14-4 which requires a removal of an executor due to waste, theft, wrongful neglect, fraud, or mismanagement. The court entered its order requiring a detailed inventory due to an inventory being lumped together and attempted to remedy any potential harm caused by a failure to obtain interest on funds by its willingness to hear further evidence concerning possible detriment to the estate. Though Ward may not have made the wisest decisions, there is evidence indicating that he acted at all times in what he thought were the best interests of the estate. Thus, the trial court could find that removal was not necessary, particularly, as Ward has since shown every willingness to comply with the court's direction.

In light of these circumstances and the alternative prayer for relief by appellants, we *do not find the court's retention of* Ward as executor to be clearly erroneous.

## II.

As the subject matter herein involves real estate, appellants contend any alleged agreement may not be enforced because of the statute of frauds requirement that there be a writing. Appellee raises the doctrine of equitable estoppel to overcome the statute and prevent enforcement of the lapse provision in the will.

■ "We are not persuaded that there is any good reason why the doctrine of equitable estoppel should not be applied in a proper case to prevent a party from asserting the statute of frauds ...." *Farmers Elevator Co. of Elk Point v. Lyle*, 90 S.D. 86, 91, 238 N.W.2d 290, 293 (1976). An "estoppel" arises, where, by conduct or acts, a party has been induced to alter his position or do that which he would not otherwise have done to his prejudice. *Willadsen v. Crawford*, 75 S.D. 161, 60 N.W.2d 692 (1953). "The doctrine ... is bottomed on principles of morality and fair dealing and is intended to subserve the ends of justice. It seeks to accomplish that which is fair between man and man." *Iverson v. Iverson*, 87 S.D. 628, 631-32, 213 N.W.2d 708, 710 (1973); *City of Rapid City v. Hoogterp*, 85 S.D. 176, 179 N.W.2d 15 (1970).

> "To create an estoppel, there must have been some act or conduct upon the part of the party to be estopped, which has in some manner misled the party in whose favor the estoppel is sought and has

caused such party to part with something of value or do some other act relying upon the conduct of the party to be estopped, thus creating a condition that would make it inequitable to allow the guilty party to claim what would otherwise be his legal rights. * * * "

*Farmers Elevator Co.*, 238 N.W.2d at 293, citing *Somers v. Somers*, 27 S.D. 500, 504, 131 N.W. 1091, 1093 (1911); *Western Cas. & Sur. Co. v. American Nat'l Fire Ins. Co.*, 318 N.W.2d 126 (S.D.1982).

John Williams testified to a telephone conversation held sometime in January 1982 in which he at least suggested to Ward that "if you decide that you're going to buy the land ... I would prefer my payment in a lump sum rather than in a payment kind of plan ...." As a result of this conversation, Ward proceeded to effectuate a plan whereby appellants could receive their inheritance in one installment. All three appellants admitted receiving a letter to this effect from the attorney for the estate, dated August 13, 1982. This letter indicated that Ward's son was attempting to secure FHA financing. It continued:

> If he is able to do this, Ward's plan is to go ahead and pay all of the heirs off on the settlement due on the land, rather than to spread the payments out over five years as provided for in the Will. It appears that this would work out better for everybody. Ward hopes to know what will develope [sic] with the FHA by sometime this fall, and as soon as he knows for sure on this, we will be able to formulate specific plans as to getting the estate settled and the distribution made. As soon as Ward knows for sure on this, will be back in touch with you, but in the meantime wanted to give you an update on the handlings of the estate.

Ward claims he informed the others of his FHA approval at a family gathering sometime in November 1982. Though this is disputed, appellant Linda Westover, did testify to overhearing a joking comment from Ward to Rosemary Sayers to the effect of "what will you do ... when I hand you a check for thirty-nine thousand dollars ...." Finally, there is a letter dated January 10, 1983, from Ward J. Williams to his siblings, again informing them of his understanding with regard to payments under the will. There is also mention of FHA approval and availability of funds.

 Appellants assert there was no "family agreement" authorizing Ward to make lump-sum payment arrangements. Certainly, there was no written agreement. The court found, as a fact, that there was a discussion among the heirs that "the payments be made in a lump sum" and "such lump sum payment was requested of the said Ward J. Williams." The court further found that "there was information sent out in connection with the estate handlings relative to the lump sum payment." The court further found "there was general knowledge among the heirs concerning such." We have a duty to look at the facts of the case and conduct of the parties when reviewing the trial court's findings of fact and conclusions of law. There was certainly acquiescence, based on knowledge and a failure to speak or act in light of that knowledge, upon which Ward reasonably relied to inaugurate a loan to accommodate his siblings. In view of the circumstances, appellants never requested an explanation or accounting from Ward. They admit to having had conversations and to receiving letters of intent, yet claim confusion as to Ward's plans. Despite this claim, no one attempted to contact Ward or the estate attorney for enlightenment. No question or discussion was ever initiated, not, that is, until December 1982, after the one-year will deadline had passed. Of course, mere innocent silence or inaction will not work an estoppel. However,

> [t]he authorities make it abundantly clear that an estoppel may arise under certain circumstances from silence or inaction as well as from words or actions.... The principle underlying such estoppels is embodied in the maxim "one who is silent when he ought to speak will not be heard to speak when he ought to be silent."

28 Am.Jur.2d *Estoppel and Waiver* § 53, at 665–66 (1966) and cases cited therein.

█ Ward relied on the silence of his siblings as confirmation of the agreement. He proceeded with a plan which necessitated allowing the will provision to lapse. This plan entailed foregoing an advantage of paying his brother and sisters off at five percent interest for at least five years and to disadvantage himself by borrowing money at a much higher rate of interest to fulfill the lump-sum commitment. There is every indication appellants had knowledge of this plan; to permit them to come forward now, after the fact, and insist on their right to enforce the lapse provision would be to sanction inequity. This we cannot do.

Upon review of all the evidence, we are left with no definite and firm conviction that a mistake has been made.

Affirmed.

WOLLMAN, DUNN and MORGAN, JJ., concur.

FOSHEIM, C.J., dissents.

FOSHEIM, Chief Justice (dissenting).

To create an estoppel there must be some act or conduct on the part of the party to be estopped, which in some manner misleads the party in whose favor the estoppel is sought and causes that party to part with something of value or do some other act relying upon the conduct of the party to be estopped, thus creating a condition that would make it inequitable to allow the estopped party to claim what would otherwise be his legal right. *Farmers Elevator Co. of Elk Point v. Lyle*, 90 S.D. 86, 238 N.W.2d 290 (1976); *Northwest Realty Company v. Colling*, 82 S.D. 421, 147 N.W.2d 675 (1967); *Somers v. Somers*, 27 S.D. 500, 131 N.W. 1091 (1911). In *Northwest Realty*, 82 S.D. at 432, 147 N.W.2d at 682, we said to constitute an equitable estoppel

> false representations or concealment of material facts must exist; the party to whom it was made must have been without knowledge of the real facts; that representations or concealment must have been made with the intention that it should be acted upon; and the party to whom it was made must have relied thereon to his prejudice or injury.

See also *Cromwell v. Hosbrook*, 81 S.D. 324, 329, 134 N.W.2d 777, 780–781 (1965).

The majority seem to totally ignore with gusto the element of false representations or concealment of material facts. None existed. It was Ward who kept telling the other heirs how he intended to meet the payment provisions. As executor of the estate, he was the mover and the shaker. He was privy to all the material facts. Where then was the false representation? Where was the concealment of material facts? Where was the absence of knowledge?

Even disregarding the essential misrepresentation element the other requirements for equitable estoppel are not met. The probate court in effect concluded that each of *the* heirs caused Ward to miss the first payment date. This is incorrect. John was the only heir who expressed to Ward his preference for a lump sum payment, and he was not aware of a family agreement concerning Ward's purchase of the farmland. A letter dated August 13, 1982, indicated that Ward was planning to make a lump sum payment and hoped to have an FHA loan by that fall. Although the letter was introduced as evidence of a definite notification of a lump sum payment, it is clear that the language is couched in contingencies. It was "Ward's plan" which would take effect in the event he would obtain the FHA loan. It made no definite promise or guarantee that Ward would buy the land under the will. It contained no specific statement that would bind Ward to make any payments by a particular time. Although there is evidence that all parties discussed the possibility of a lump sum payment, there was no commitment on the part of Ward to make the payment in this fashion.

Because the statute of frauds controls agreements concerning the sale of real estate it was essential that any family agreement affecting that real estate be executed

in writing. SDCL 53–8–2. No writing was introduced into evidence which would have bound Ward to make a lump sum payment in lieu of payment according to the will provisions. Considering the evidence most favorable to Ward it is nevertheless clear that there was only general discussion with his two sisters concerning lump sum payment. There is no evidence that the sisters ever expressly agreed to waive the will provisions.

An estoppel was not created and should not be used to defeat the payment requirements clearly stated in the will. Where the intention of the testator as expressed by the will is clear and unambiguous, as here, the law must give effect thereto. *In re Hurley's Estate*, 61 S.D. 233, 248 N.W. 194, 94 A.L.R. 13 (1933). In the past, this court has steadfastly enforced that intent.